18124

The STATE, Respondent, v. John MORRIS and Edward Williams, Appellants

(133 S. E. (2d) 744)

*Messrs. Jenkins & Perry,* of Columbia, *for Appellant, Edward Williams,*

*Messrs. F. Ehrlich Thomson* and *Hutto & Hutto,* of Columbia, *for Appellant, John Morris,*

*John W. Foard, Jr., Esq., Solicitor,* of Columbia, *for Respondent,*

November 18, 1963.

BUSSEY, Justice.

The defendants-appellants were tried jointly; the appellant John Morris being convicted of the murder of one Martha Green Roof, and the appellant Edward Williams being convicted as accessory before the fact to the same murder. The verdict of the jury as to both appellants was guilty, without any recommendation of mercy, and both appellants, in accordance with the law of this state, were sentenced to death by electrocution.

The facts fully established by the evidence including the confessions of the appellants, are as follows: John Morris, allegedly 76 years of age at the time of the trial, is a brother-in-law of his co-defendant Edward Williams, a much younger man. About 1950, John Morris was convicted of murder and sentenced to life imprisonment, but was paroled during the early part of 1961. Williams was instrumental in obtaining the parole.

Williams, although illiterate, owned his own business and was apparently reasonably successful, and, in 1961 and for some time prior thereto, operated a beer parlor and/or cafe at the corner of Washington and Park Streets in the City of Columbia, about one block from police headquarters of that city.

Williams, on October 5, 1961, acquired a policy of life insurance in the amount of three thousand dollars on the life of one Martha Green Roof, she being named in the policy simply as Martha Green. The policy was payable to Edward Williams, an uncle of the insured, as beneficiary, although in point of fact Williams was no relation to the insured. Williams paid the premiums on the policy.

Some weeks later, apparently during the early part of December, 1961, Williams approached Morris and sought to induce him to murder the said Martha Green Roof for the purpose of collecting the insurance. Williams promised Morris five hundred dollars to do the job, with Williams

furnishing a 38 caliber pistol for the purpose. That night Morris started out with the pistol, furnished by Williams, and with Martha to commit the crime but lost his nerve and returned Martha to the cafe and the gun to Williams. On this occasion Morris told Williams, in effect, that he could not get Martha to go with him to a point where it was safe to do the job.

On Wednesday, January 3, 1962, the appellants and the victim being again at the place of business of Williams, after considerable drinking had been engaged in by the parties, Williams again gave Morris his pistol and advanced Morris the sum of four dollars to be used by Morris to pay Martha for having a date with him at his room. To make sure that Martha would go far enough with Morris to be murdered, Morris gave the four dollars back to Williams, in the presence of Martha, to be delivered by Williams to Martha after she had filled her date with Morris.

Morris and Martha then left together and, as they were walking along a railroad track en route to the room of Morris, he, Morris, fired four shots at Martha, three of the bullets striking her and killing her almost instantly. Thereafter, Morris returned to Williams' place of business, returned the pistol and reported to Williams that "I've done the job."

The body of the victim was discovered between 8:15 and 8:30 P. M. on the same night; an investigation was commenced by the authorities and by January 8th, Morris was in custody as a suspect. Williams was questioned on the night of January 8th, and again on the night of January 9th, but was not incarcerated and charged with participation in the crime until January 10th, on which date both appellants, independently of each other, made full confessions of their respective parts in the crime.

Morris was represented at the trial by counsel appointed by the court, and Williams by counsel whom he employed. Both have appealed and we shall first consider the questions raised by the appellant Morris.

Morris took the stand in his own behalf and testified in detail as to his previously confessed participation in the crime, and repudiated no material fact contained in his written confession. In his confession, however, he mentioned nothing with respect to motive other than the money which he expected to receive from Williams out of the insurance proceeds. On the stand, his testimony was to the effect that money was only incidental, one of his answers with respect to questions about the money being as follows:

"He said he'd give me five hundred dollars. I told him I didn't want the money; I just wanted my freedom."

His testimony was further to the effect that he was on parole from a life sentence; that Williams had been instrumental in his obtaining a parole; and that Williams had threatened to get his parole revoked and Morris returned to the penitentiary if he, Morris, didn't go through with the crime, and that fear of this happening was his (Morris') real motive in the perpetration of the crime.

While Morris himself brought out the fact on direct examination that he was on parole from a life sentence, he did not say what crime he was serving a life sentence for. On cross examination, the solicitor, over the objection of defense counsel, was allowed to elicit from Morris the information that he was under a life sentence for murder, and Morris now contends that such was error.

It is argued that since Morris in his testimony fully corroborated his confession and testified as to his own guilt, his credibility was not in issue and subject to attack by the State.

It is, of course, the general rule that when a defendant takes the stand in his own behalf, proof of prior violations of the law by the defendant are admissible only for and limited to the purpose of impeaching his testimony. *State v. Bolin,* 177 S. C. 57, 180 S. E. 809; *Gantt v. Columbia Coca-Cola Bottling Co.,* 204 S. C. 374 29 S. E. (2d) 488; *State v. Van Williams,* 212 S. C. 110, 46 S. E. (2d) 665.

Here, however, we think that Morris clearly put his credibility in issue at least with respect to his testimony as to his motive, if in no other respect. He having himself brought out the fact that he was serving a life sentence, and thus put his credibility in issue as to his motive, we think the circuit judge properly allowed the State to ask him what he was serving a life sentence for. In this connection we call attention to Section 26-406 of the 1962 Code of Laws, which section we think is clearly applicable here. See also the case of *State v. Murphy*, 216 S. C. 44, 56 S. E. (2d) 736.

The only other question raised by Morris arose out of the following occurrence. After the jury had been deliberating several hours, the jury returned to the court room and requested, among other things, that the entire testimony of Morris be read to it, which was done. Thereafter, the foreman asked the court the following question:

"Would the fact that a person is on parole from a life sentence, have any effect on the type of verdict that might be rendered?"

The Court replied:

"It has no connection with the offense charged. That's the only way I can answer and this (that) case has no connection with the offense charged as of (to) the alleged commission of this crime."

Morris contends that the court erred in the foregoing response to the foreman's question and that the court should have charged Sections 55-611 and 55-612 of the 1962 Code of Laws governing paroles from life sentences and that the defendant's previous record would be carefully considered before any action would be taken toward granting a parole.

From the language used by the foreman, it is not precisely clear just what information he sought to elicit. Certainly, if the jury desired information as to Morris' eligibility for parole in the event of a recommendation to mercy,

the question did not explicitly ask therefor. The language used by the court in reply would indicate that the court did not at the time construe the question as seeking information as to the possibility of a parole. The record would indicate that counsel did not place upon the said question, at the time, the construction thereof now argued, as no objection was made to the response by the judge and no request was made for any further charge or for elucidation of either the question or the trial judge's response. Under the circumstances, we think the court was justified in placing the construction upon the question the court did, and in answering the question as it did. Had the court of its own volition gone beyond the answer which the court gave, and given the jury information as to the possibility of parole, it could well be argued that the court erred in doing so to the prejudice of Morris.

The question of whether a trial judge should answer and, if so, how he should answer, explicit questions coming spontaneously from the jury, with respect to the possibility of pardon or parole from any sentence imposed by the verdict of a jury, has been a subject of a great deal of judicial consideration in many jurisdictions. See 23A C. J. S. Criminal Law § 1379, p. 1012, footnotes 34.5, 34.10 and 34.15; 35 A. L. R. (2d) 761, *et seq.*

There is, to say the least, a considerable lack of unanimity in the views of jurists who have considered the problem. At least a part of the division of authority on this question arises out of the fact that in some jurisdictions the power of a jury to recommend mercy and effect a diminution of punishment is to some extent circumscribed, while in others (as in South Carolina) the jury, once it has found a defendant guilty in a capital case, has unbridled discretion to effectively recommend or not to recommend to mercy.

Since the question of the foreman did not explicitly seek information as to the possibility of a parole, we are not here called upon to decide what rule we should adopt or follow in a case where such information is spontaneously and explicitly sought by the jury, and we do not do so.

Since the questions raised by the appellant Williams deal largely with evidence obtained against him in the course of the investigation, it is well to first briefly relate the facts insofar as the obtaining of evidence against Williams is concerned. Although the record is not clear on the point, it is inferable that the investigating officers soon learned that Martha Green Roof had last been seen alive at the place of business of Williams. In any event, Williams made a show of helping the officers investigate the crime and went on at least one occasion, probably January 5th, to police headquarters and offered his assistance. On Monday afternoon, January 8th, one of the investigating officers, being previously quite familiar with the place of business operated by Williams, went there and observed that a 38 caliber pistol which Williams normally kept in plain view by the cash register, was not in sight. Without making any inquiry at that time about the pistol, the officer left but returned later the same evening accompanied by two detectives and at that time the officers queried Williams as to the whereabouts of his pistol. Williams thereupon unlocked a drawer and took therefrom and gave to the officers his 38 caliber pistol, which later proved by ballistic tests to be the murder weapon. Following this, Williams was taken by the officers to headquarters where he was questioned for approximately an hour and a half by the investigating officers as to his knowledge of the crime. The coroner of Richland County was on the scene during at least a part of the questioning, and upon its conclusion, Williams was released in custody of his attorney.

On Tuesday night, January 9th, Williams was again questioned, more or less briefly, at police headquarters, and again released in custody of his attorney. How he got to police headquarters on the night of January 9th does not appear in the record. He may have been summoned, brought in by an officer, or come of his own volition as he had on a prior occasion.

On the morning of January 10th, Williams was at police court as the prosecuting witness in another case and was

arrested around 9:30 or 10 o'clock that morning and detained for further questioning, which did not occur until about 3:30 that afternoon. In the intervening time his co-defendant, Morris, had confessed and following a very brief period of questioning, Williams made a full confession of his participation in the crime.

In the course of the investigation, officers went to the home of Williams and requested of his wife that she give them the insurance policy upon the life of Martha Green, hereinabove referred to. The wife, without any objection, complied with the request and handed the policy to the officers. The officers did not have a search warrant when they obtained the pistol from Williams, nor did they have one when they obtained the insurance policy from his wife.

Williams now contends that the court erred in receiving in evidence the pistol and the insurance policy, alleging that both were obtained by the police officers in violation of the Fourth and Fourteenth Amendments to the United States Constitution and Article I, Section 16, of the Constitution of South Carolina. The only authority cited in support of this contention is the recent decision of the United States Supreme Court in *Mapp v. Ohio,* 367 U. S. 643, 81 S. Ct. 1684, 6 L. Ed (2d) 1081. That decision for the first time imposed upon the states the rule, long in effect in the Federal Courts, that evidence obtained as the result of an unlawful search and seizure must be excluded. There is nothing, however, in that opinion which would support the contention of the appellant here that either the pistol or the insurance policy were obtained in violation of the constitutional prohibition against unlawful search and seizure. The evidence is clear that the officers simply requested these particular articles, both of which were immediately, promptly and voluntarily delivered to the officers.

The argument of counsel is to the effect that mere knowledge of Williams and his wife that the officers were in fact police officers amounted to coercion and force. No authority is cited in support of this conten-

tion and we deem it to be without merit. The constitutional prohibitions do not prohibit a seizure without a warrant where there is no need of a search. Search implies invasion and quest and that implies some sort of force, actual or constructive, much or little. *State v. Quinn,* 111 S. C. 174, 97 S. E. 62, 3 A. L. R. 1500. A search ordinarily implies a quest by an officer of the law and a seizure contemplates a forceful dispossession of the owner. *Hale v. Henkel,* 201 U. S. 43, 26 S. Ct. 370, 50 L. Ed. 652.

In *McCoy v. State of Indiana,* 241 Ind. 104, 170 N. E. (2d) 43 (1960), it was held that, where a son of the defendant got stolen property from the home of the defendant at the request of police officers who were standing on the porch thereof, there was no unlawful search and seizure.

In the *Florida case* of *Irvin v. State,* Fla., 66 So. (2d) 288, Cert. denied 74 S. Ct. 316, 346 U. S. 927, 98 L. Ed. 419, rehearing denied 74 S. Ct. 479, 347 U. S. 914, 98 L. Ed. 1070, a defendant arrested for rape told officer that clothes he had been wearing on the night in question were at his home, and officer appeared there without more display of authority than his presence, politely asked the defendant's mother for the clothes, and she produced them without protest and the officer received them without any exploration whatever. It was held that such were not obtained by "unlawful search and seizure."

Williams further contends that his confession was coerced under circumstances amounting to a denial of due process of law, guaranteed by the Federal and State Constitutions. In support of this contention Williams relies upon the following decisions of the United States Supreme Court. *Watts v. State of Indiana,* 338 U. S. 49, 69 S. Ct. 1347, 93 L. Ed. 1801; *Turner v. Commonwealth of Pennsylvania,* 338 U. S. 62, 69 S. Ct. 1352, 93 L. Ed. 1810; *Harris v. State of South Carolina,* 338 U. S. 68, 69 S. Ct. 1354, 93 L. Ed. 1815.

No good purpose would be served here by reviewing the facts in the cited cases. Suffice it to say that the extreme

circumstances which were held to vitiate the confessions in those cases are totally different from the facts of the instant case. Here, the entire questioning of Williams, on three separate occasions, as to his knowledge of or participation in the crime did not consume more than three hours. The record is free of any evidence of force, intimidation, coercion or promise of reward. It is true that counsel was not present during any of the three separate periods of questioning, but he was represented by and had available to him counsel from the inception of the case. He was advised of his right to remain silent, and during most of the time he was under investigation, was at large, free to confer with his family, his friends and his lawyer. Under these circumstances, we see no merit in the contention that his confession was coerced.

The only other error alleged on behalf of Williams arose out of an occurrence in the course of the deliberation of the jury. The jury retired to deliberate at 4:05 P. M. on the afternoon of April 18, 1962, and reached a verdict at 1:27 A. M. the same night. The occurrence complained of appears in the record only in the statement of the case in the following language, appearently dictated by the trial judge:

"Later in the evening, on April 18th, after several hours of deliberation, the Foreman of the Jury, under circumstances, now detailed by the Presiding Judge, which forms a part of this statement, announced that the Jury was deadlocked. The Presiding Judge was standing in the hallway leading from the Court Room to the Jury Quarters and only a few feet from the Jury Room. Without knocking or without any warning the Foreman of the Jury opened the door to the Jury Room and announced to the Bailiff that the Jury was either dead-locked or hopelessly dead-locked. This announcement was heard by the Presiding Judge but no comment was made by the Presiding Judge or orders issued to the Foreman. The Bailiff returned the Foreman to the Jury Room.

"According to the recollection of the Trial Judge no one was present in the hallway but himself, the Bailiff and the Foreman when he came out of the Jury room."

Exceptions on Williams' behalf impute error to the trial judge in refusing to declare a mistrial under the circumstances, and in failing to order the jury to return to the court room and announce to appellant and his counsel that they were hopelessly deadlocked.

Counsel states the question raised by the foregoing exceptions as being "Whether the court erred in failing to recall the jury to the court room and examine them concerning their being deadlocked." It is argued, without any citation of authority, that under the circumstances, it was incumbent upon the presiding judge to have the jury recalled to the court room and, in the presence of counsel, inquire into their ability to reach a verdict.

How the appellants, or either of them, were prejudiced by the failure of the judge to so do is not even suggested, nor is it suggested how calling the jury to the court room would have been of any benefit to either of the appellants. We are not here concerned with any communication between the judge and the jury in the absence of accused or counsel, nor are we concerned with any question of the jury returning to the court room more than one time and announcing a deadlock so as to make applicable the provisions of Section 38-303 of the 1962 Code of Laws. The only mention in the record of a deadlock by the jury at any time was the statement to the bailiff by the foreman, above referred to.

The exact time of the occurrence complained of does not appear in the record, but counsel for Williams argued in their brief that such occurred at approximately midnight and the record shows that the verdict was returned at 1:27 A. M.

Although it is not expressly argued that the judge should have granted a mistrial, "Whether a jury charged with the trial of a case may be discharged before rendering a verdict must necessarily rest in the dis-

cretion of the court, exercised according to established principles." *State v. Stephenson,* 54 S. C. 234, 32 S. E. 305. In this connection see also *State v. Stalvey,* 146 S. C. 275, 143 S. E. 817; *State v. Council,* 129 S. C. 116, 123 S. E. 788; *State v. Underwood,* 127 S. C. 1, 120 S. E. 719. There is nothing in the record to even suggest any abuse of discretion on the part of the trial judge in this connection.

The exceptions of both appellants, being in our view without merit, we have, in application of the rule *in favorem vitae,* carefully searched the record to ascertain if any prejudicial error, not raised by the exceptions, occurred in the course of the trial, and have concluded that the record is free of prejudicial error and that both appellants were accorded a fair and impartial trial in accordance with established law.

Affirmed.

TAYLOR, C. J., and MOSS, LEWIS and BRAILSFORD, JJ., concur.