18997

The STATE, Respondent, v. Edward RICHBURG, Appellant

(171 S. E. (2d) 592)

*Messrs. Matthew J. Perry,* of Columbia, and *W. Newton Pough* and *Zack E. Townsend,* of Orangeburg, and *Jenkins, Perry & Pride,* of Columbia, *of Counsel, for Appellant,*

*Julian S. Wolfe, Esq., Solicitor,* of Orangeburg, *for Respondent,*

December 18, 1969.

LITTLEJOHN, Justice.

The defendant, Edward Richburg, was indicted for murder and convicted of manslaughter for the wrongful killing of Orangeburg County Deputy Sheriff, J. Leroy Myers. From the conviction (and sentence of 18 years) he has appealed to this court.

The case has been before this court upon a previous conviction of murder and sentence to death. A new trial was granted. See *State v. Richburg*, 250 S. C. 451, 158 S. E. (2d) 769 (1968).

Early in the night or late in the afternoon of June 4, 1965, the deputy chased the defendant in his automobile because of an alleged traffic violation (driving too fast for conditions). At the end of the chase the defendant pulled into the yard of his place of business, a combination service station, garage and club, known as the "Crazy Baby." The deputy talked with him and wrote out a traffic violation ticket. A difficulty ensued resulting in the deputy being killed by gun shot wounds and the defendant being wounded.

It is the contention of the State that the deputy was making a lawful arrest for a traffic violation committed in his presence, and that the defendant refused to cooperate, went to his home nearby to procure a pistol, came back and shot the deputy to death.

It is the contention of the defendant that he did not have with him money to pay a fine and/or a bond, and that he was willing to go before the magistrate or come in the next day. The defendant further contends that the deputy pushed and hit him and shot him in the head. The defendant asserts that he then went into the Crazy Baby and got a pistol, went back outside and shot the deputy in self defense only after having been shot himself and after having pleaded for his life.

There are three questions set out by the defendant in his brief for our determination, as follows:

"1. Whether the Court erred in receiving as evidence State's Exhibit No. 1, a pistol?

"2. Whether the Court erred in refusing to enter Judgment of Acquittal?

"3. Whether the Court erred in refusing to hold that, on the evidence presented, [the defendant] shot the deceased in self defense?"

We first rule on the evidentiary question relative to admissibility into evidence of the pistol used to kill the deputy so as to have before us all the evidence properly considered by the trial judge in ruling on the other two questions which involve matters of law only.

In the trial of the case the State offered in evidence the pistol used by the defendant to shoot the deputy. Considerable evidence from both sides was first taken by the trial judge out of the presence of the jury before a ruling was made that the pistol should become an exhibit. That evidence related to the procurement of the weapon from the home of the defendant and his wife.

The evidence shows that after the exchange of gunfire, and after the defendant was wounded, his wife took the pistol out of his hand and placed it in the attic of their home just back of the store.

Shortly after the altercation the defendant's wife was taken into custody and placed in the jail at Holly Hill by

Deputy Sheriff Fox Hill, who testified that he told her she was being held as a material witness. Her sister was there and agreed to take care of the children.

A few hours later, at approximately two o'clock in the morning, J. P. Strom and other law enforcement officers went to the jail to talk to her concerning the whereabouts of the gun. In the custody of the officers she went to her home, reached into the attic and gave to them a pistol which ballistics experts' testimony proved to be the gun which fired the bullet that killed the deputy.

Her testimony relative to her actions in leaving the jail and going to the home and turning the pistol over to the police would, if believed, create an inference that she did so because of fear, duress or coercion.

On the other hand, evidence presented by the State, including testimony of Law Enforcement Division Chief Strom, would, if believed, show that there was no force or show of force or threat or coercion of any kind, and that the action of the wife was free and voluntary. Chief Strom testified that he did not promise her anything. He also advised her that she did not have to make a statement, and that she was not accused of anything.

No search in the usual sense of the word is involved in this case. At most, it might be argued that there was a seizure through coercion. It is academic that no search warrant (and there was none here) is required when consent to deliver an object is given. *State v. Morris,* 243 S. C. 225, 133 S. E. (2d) 744 (1963). When the issue of the admissibility of the pistol came before the court a determination had to be made by the judge after the two interested parties were permitted to present evidence to their own satisfaction in the absence of the jury. In effect there came into being a little trial within a big trial. The judge had to try the issue: "Is the pistol admissible in evidence?" Incident to his determination he was also required to determine if the pistol was procured by coercion or other improper methods, and if it

was given to the police officers by consent. In order to make the determination he was required to evaluate all of the evidence and give to each witness' testimony such meaning and credibility as it should have. In weighing the testimony he had the benefit of gazing upon the countenances of the witnesses and was entitled to consider, among other things, the interest of the wife in testifying as she did. It is argued that the overall circumstances prove beyond question that the action of the wife was not voluntary. Such circumstances were paraded before the trial judge and were matters for him to consider in making his final ruling. We cannot say that the trial court's finding that the pistol should be admitted in evidence was erroneous. It is implicit in his ruling that he concluded that the pistol was not illegally or improperly procured. The exception cannot be sustained.

We now consider the other two questions submitted in the light of all the evidence, including the pistol.

Under Question No. 2 as set out above it is submitted that the trial judge should have directed a verdict of acquittal at the end of the State's case, or after the conviction should have arrested the judgment on the ground that the State failed to establish a *prima facie* case so as to require the defendant to go forward with evidence to support his plea of self defense. A *prima facie* case is made out against a defendant if there is sufficient proof to find him guilty if he does not submit any evidence. At the time of the motion for acquittal defendant had not, of course, admitted that he fired the weapon that killed the deputy nor described the happenings incident to the shooting. The ballistics expert had, however, testified that the fatal bullets came from defendant's gun.

At the time the motion for acquittal was before the court we think that the State had fulfilled the *prima facie* requirement even though there was no direct evidence as to what person fired the fatal bullets. There was before the court evidence that the deputy left a friend's house

a short distance from the Crazy Baby in pursuit of a speeding car, and that he pulled into the place of business just behind the defendant; that the deputy and the defendant talked; that a summons ticket was made out charging the defendant with driving too fast for conditions (such was found in the deputy's summons book along with the defendant's drivers license); that the sound of a gun was heard; that around 8:30 or 9:00 o'clock the defendant was taken in a bloodied condition by a friend to the defendant's uncle's house; and that an officer arrived on the scene at 8:41 p. m. and found the deputy critically wounded. There was further evidence before the judge and the jury at the end of the State's case that the deputy died from hemorrhaging caused by bullets fired from the pistol of the defendant which was delivered to the police authorities by the defendant's wife under circumstances as set out hereinabove.

Under the evidence which was before the trial judge we think he correctly held that he could not as a matter of law terminate the case and free the defendant. A *prima facie* case was made out so as to require the defendant to go forward with his plea of self defense.

Lastly, the defendant argues that the trial judge should have, as a matter of law, directed a verdict of not guilty at the end of all of the evidence because the defendant had proved his plea of self defense. This same issue was before this court on the previous appeal cited above. Inasmuch as the evidence is not identical we consider the issue again based solely on the more recent transcript of record now before us. Since a new trial was granted we did not in the previous opinion detail the evidence which the defendant contended established self defense.

Defendant testified that while the deputy had his book in his hand to write out a traffic ticket he stated, "You were speeding and the fine is $27.00." He also testified on cross examination that the deputy told him to put up a $27.00 bond, but that he did not have $27.00. Defendant says he

denied that he was speeding and said, "If you feel like I was speeding, let's go to either one of the Judges and see what the Judge would say." Thereupon, he testified, the deputy accused him of calling him (the deputy) a liar. Defendant contends that the deputy then pushed him and hit him and when he fell back the deputy pulled his gun and shot him in the head. The defendant then walked or ran towards the store building and was shot in his left leg. As he reached the door, he heard another shot and felt another pain in the other thigh.

The defendant proceeded into the building, reached over the counter and procured a gun and placed it in his pocket. The deputy entered the building through a different entrance and the defendant ran out the door around the northwest corner of the building. The defendant testified that he stood behind a barrel with the gun in his pocket and held the barrel up for protection. He states that the deputy was standing in front of him, aiming his gun at him. The defendant started pleading with the deputy not to shoot him any more, and was told that he would kill him. The defendant's wife came out of the building and pleaded with the deputy not to shoot the defendant and was told by the deputy, "If you don't get out of the way I am going to shoot you." Defendant says he told his wife to call for help. Then the defendant commenced feeling weak and dropped the barrel which he had been holding in front of him for protection, and the deputy shot him in the stomach. Defendant says he dropped to his knees and then took the gun from his pocket and shot the deputy.

Defendant's wife, Susannah Richburg, testified that she was in the store serving ice cream when her husband came in to get the gun. She says she heard her husband say to the deputy, "Mr. Myers, please don't shoot me any more." She ran to the outside of the building and testified that she saw Mr. Myers "hitting my husband with his left hand and the gun was in his right hand shooting." She said that her husband was shielding himself with the drum. It is her testi-

mony that she asked Mr. Myers not to shoot her husband any more and that he stated that he would shoot her too. She ran back in the store and left them both.

The only testimony as to the sequence of the events of the actual shooting is that of the defendant; however, his wife did corroborate his testimony that the deputy shot first.

The General rule in such situation is that "(t)he testimony of (the defendant) and his witnesses is not conclusive." 41 C. J. S. Homicide § 326 (1944). The jury may consider the fact that the defendant is in fact the defendant, and also that the wife has a profound interest in the outcome. The fact that the testimony goes uncontradicted does not necessarily mean that the defendant should be found not criminally liable, for the jury must also satisfy itself as to the likelihood of the events occurring as the defendant and his wife testified they did.

A trial judge is not justified in instructing a jury that witnesses have told the truth, and in directing a verdict based on the truthfulness of the evidence even though testimony is not directly contradicted, unless there is nothing in the circumstances or surroundings tending to impeach the witnesses or to throw discredit on their statements. If there is anything tending to create distrust in the truthfulness of the witness, the question of guilt or innocence must be left to the jury. *State v. Brown,* 205 S. C. 514, 32 S. E. (2d) 825 (1945).

We find several things which justify the jury in giving to the defendant's evidence less than full credibility. At least reasonable men could disagree concerning the believability of relevant testimony.

Here the defendant asked the jury to believe that he was shot three times before procuring a gun from the store and placing it in his pocket while he went outside and stood behind a steel barrel to shield himself and stayed until the deputy shot him again. The jury may easily have found it difficult to believe this testimony.

Witness James Brown, for the State, testified that he was riding with the defendant when the chase ended in front of the Crazy Baby. He said that he went inside the store and left the defendant and the deputy talking on the outside. He stated that he heard the sound of a gun and remained on the premises for about five minutes thereafter. Though he was in the store where Richburg said he went to procure the gun after the shooting commenced, Brown did not know whether the defendant came in the store or not.

Witness Rhinehart Chewning testified that he passed the Crazy Baby in the late afternoon of June 4, 1965 and saw the deputy sitting in his car in front of the store, with his left door open and his left foot on the ground. He did not see any other person in or about the premises.

Witness E. W. Shuler testified that he passed the Crazy Baby late in the afternoon of the same day and saw Deputy Myers standing in front of his car. He did not see anyone else in the yard or on the premises of the Crazy Baby.

The testimony of these two witnesses is inconsistent with that of the defendant, who testified, "I was there with him until the shooting stopped."

Lt. Leon Gasque of the Law Enforcement Division testified that he found the defendant at the home of a kinsman in an adjoining county about midnight, wounded and in bad physical condition. Gasque carried the defendant to the emergency room at the Moncks Corner hospital, at which time he removed $39 to $40 from his shirt pocket. This is inconsistent with his statement that he did not have $27 at the time Myers wrote the ticket at the Crazy Baby. The defendant testified relative to this that his uncle had placed this money in his shirt pocket prior to Gasque's arrival so he could pay the doctor.

We conclude from a study of the whole of the evidence that the trial judge would not have been justified in turning to the jury and saying in effect, "You have no alter-

native other than to believe all of the defendant's testimony and his version of what took place." Issues of fact for determination by the jury were made out to the exclusion of questions of law for decision by the trial judge alone. It became the duty of the jury to weigh the evidence and to determine the believability of the testimony and the likelihood of the occurrence happening as contended by the defense.

The exceptions are overruled and the lower court is

Affirmed.

Moss, C. J., Lewis and Bussey, JJ., and Louis Rosen, Acting Associate Justice, concur.