STATE OF NORTH CAROLINA v. O'NEAL REAMS

No. 43

(Filed 16 December 1970)

1. **Criminal Law § 84; Searches and Seizures § 1— unreasonable searches and seizures — inadmissibility of evidence**

Evidence obtained by an unreasonable search and seizure is inadmissible. Fourth and Fifth Amendments to U. S. Constitution; Article I, § 15, N. C. Constitution; G.S. 15-27.

2. **Criminal Law § 84; Searches and Seizures § 1— reasonableness of search — determination by court**

Whether a search is unreasonable is determined by the court upon the facts of each individual case.

3. **Criminal Law § 84; Searches and Seizures § 1— absence of search — seizure without warrant**

The constitutional guaranty against unreasonable searches and seizures does not prohibit a seizure of evidence without a warrant where no search is required.

4. **Criminal Law § 84; Searches and Seizures § 1— delivery of evidence to officer upon request — absence of search**

When evidence is delivered to a police officer upon request and without compulsion or coercion, there is no search within the constitutional prohibition against unreasonable searches and seizures.

5. **Criminal Law § 84; Searches and Seizures § 1— evidence delivered by defendant's wife at officer's request — absence of search**

There was no search within the constitutional prohibition against unreasonable searches and seizures when defendant's wife displayed to officers at their request a shotgun which she had told them defendant had, or when she later delivered the shotgun to an officer in defendant's home after telling another officer that he "could come by and get the gun," where there is no evidence of forcible dispossession or that any of the officers examined defendant's home or engaged in any exploratory quests implying coercion, intimidation or force, actual or constructive, which resulted in the shotgun being delivered to them.

6. **Homicide § 4— first degree murder defined**

Murder in the first degree is the unlawful killing of a human being with malice and with premeditation and deliberation.

7. **Homicide § 14— intentional use of deadly weapon causing death — presumptions**

When the defendant admits or the State satisfies the jury beyond a reasonable doubt that the defendant intentionally used a deadly weapon and thereby proximately caused the death of a human being, the law raises presumptions that the killing was unlawful and with malice, thereby constituting murder in the second degree.

**8. Homicide § 4— premeditation defined**

Premeditation means thought beforehand for some length of time, however short.

**9. Homicide § 4— deliberation defined**

Deliberation means an intention to kill, executed by defendant in a cool state of blood, in furtherance of a fixed design to gratify a feeling of revenge or to accomplish some unlawful purpose, and not under the influence of a violent passion suddenly aroused by some lawful or just cause or legal provocation.

**10. Homicide §§ 4, 18— premeditation and deliberation — inference from brutal slaying**

Premeditation and deliberation may be inferred from a vicious and brutal slaying of a human being.

**11. Homicide § 18— premeditation and deliberation — threats against victim**

Evidence of threats against the victim is admissible to show premeditation and deliberation.

**12. Homicide § 21— first degree murder — premeditation and deliberation — sufficiency of evidence for jury**

The trial court properly submitted the issue of first degree murder to the jury where the State's evidence tended to show that the body of the victim was found lying in the street, that her death was caused by shock and hemorrhage resulting from a shotgun blast that removed part of her lower face, that three spent shell casings found near the body had been ejected from a gun found in defendant's home, that a few minutes before the shooting defendant was seen with the victim near the place where the body was found, and that defendant had threatened to kill the victim.

APPEAL by defendant from *Canaday, J.,* 6 April 1970 Regular Session of DURHAM Superior Court.

Defendant was tried upon a bill of indictment charging him with murder in the first degree. He entered a plea of not guilty.

The State offered evidence tending to show that at about 11:15 p.m. on Thursday, 26 February 1970, Loretta Mae Bratcher was killed by a shotgun blast. Police arrived on the scene in about twenty minutes and began their investigation. The victim's body was found lying in the street in front of her home. Three spent shotgun shells were found near her body. Willie McKiver identified State's Exhibit 4 as a shotgun which he had loaned defendant sometime after Christmas 1969, and stated that defendant had never returned the shotgun to him.

Police Officer Brown testified that he knew defendant O'Neal Reams and that he recognized State's Exhibit No. 4.

The officer was then asked where he had seen the shotgun and, upon objection and motion to suppress by defendant's attorney, the court excused the jury and conducted a *voir dire* hearing.

The State's evidence on *voir dire,* in substance, showed: Detective Cameron and Officer Holt went to defendant's house on the morning of Friday, 27 February 1970, at about 1:00 o'clock a.m. Detective Cameron knocked on the door and defendant's wife came to the door. They identified themselves as police officers and asked if her husband was at home. She stated that her husband left home at about 8:30 p.m. and had not returned. She was then asked if her husband owned a shotgun, and she answered in the affirmative. The officers asked if they could see the gun, and defendant's wife went to a closet, obtained the gun and gave it to the officers for inspection. The officers returned the gun to her and left, after telling her that Loretta Mae Bratcher had been hurt and that her husband was a suspect. At that time neither of the police officers stated that they wanted to make a search. The primary reason for going to defendant's home was to question him, and the officers did not intend to make a search for any object. On this occasion they had no warrant for arrest or search.

On the afternoon of Friday, 27 February 1970, police officers, without a warrant, searched for defendant in his house. They were not looking for a weapon, but for defendant. They failed to find defendant, and left. On the morning of Saturday, 28 February 1970, defendant surrendered to the police, and around noon of the same day his wife came to police headquarters and sought out Detective Cameron. She told him she had not told the truth when she had previously stated to him that her husband had not at any time returned to their house on the night of the homicide. She stated that, in fact, he returned for a short time around 11:00 o'clock and that she did not see him when he left on this occasion. She did see him return to their home at about 11:30 when he placed the shotgun in the closet and left again. Detective Cameron asked her if he could get the gun, and she said that he "could come by and get the gun." Officer Brown, upon request by Detective Cameron, went to defendant's home at about 12:30 p.m. on 28 February, and at that time defendant's wife went to the closet, obtained the gun and gave it to Officer Brown. Defendant offered no evidence on *voir dire.*

At the conclusion of the *voir dire* hearing, the trial judge found extensive facts and thereupon entered conclusions of law as follows:

1. That Mrs. Cammie Reams, wife of the defendant, on February 27, 1970, voluntarily displayed the shotgun in question to Officers Cameron and Holt; that at this time she was under no compulsion, the officer not having requested that they be permitted to search defendant's house and not having made an attempt to search defendant's house;

2. That Mrs. Reams on February 28, 1970, voluntarily and of her own initiative sought out Officer Cameron and told Officer Cameron that he could take the shotgun into his possession if he desired to do so and that, thereupon, Officer Brown at the request of Officer Cameron went to defendant's residence to obtain this shotgun and Mrs. Reams voluntarily delivered the shotgun to Officer Brown;

3. That the search for the shotgun was not necessary under these circumstances and a search for the shotgun was not made by the Officers.

The court then denied defendant's motion to suppress the evidence relating to the shotgun.

The jury returned to the courtroom and Detective Cameron then testified that he sent the shotgun and the three spent shells found near the body of the victim to the FBI Laboratory in Washington for analysis.

Bobby D. Blackburn, a Special Agent with the FBI, was qualified as an expert in the field of firearms identification. He testified that he had seen State's Exhibit 4 (shotgun) and State's Exhibits 5, 6 and 7 (spent shells), and, after describing the tests made by him, concluded that at least two of the shells had been fired from State's Exhibit No. 4.

Delores Bratcher testified:

" . . . that O'Neal Reams came to her house on the Friday preceding the day Loretta Mae Bratcher was killed and asked if she, Delores Bratcher, had seen Loretta; that Delores Bratcher said no she had not seen her and O'Neal Reams just kept right on talking, saying that he wanted to find her and talk to her and find out what she wanted to

do, whether or not they were going to still go together; and then O'Neal Reams said 'no, I don't want to talk to her, I am going to kill her'; and said, 'if it is the last thing I am going to do'; and further said 'I am going to kill her if I have to go in Anna Bratcher's house and get her.' Delores Bratcher further testified that she saw the defendant, O'Neal Reams, in January 1970 at Loretta Mae Bratcher's house in Few Gardens where the defendant and Loretta Mae Bratcher had a big fight; that the defendant drew his pistol on Loretta Mae Bratcher."

The State offered evidence which tended to show that a few minutes before the homicide occurred, defendant was with deceased near the place where her body was later found.

Defendant offered no evidence.

The jury returned a verdict of guilty of murder in the first degree with recommendation of imprisonment for life. Defendant appealed from judgment imposed.

*Attorney General Morgan and Staff Attorney Blackburn for the State.*

*Charles Darsie and W. G. Pearson II, for defendant.*

BRANCH, Justice.

Defendant assigns as error the denial of his motion to suppress evidence relating to the shotgun that his wife delivered to police officers. He contends that this evidence was obtained by an unreasonable search of his home in violation of the constitutional rights secured to him by the Fourth and Fifth Amendments to the United States Constitution and by Article I, Section 15 of the North Carolina Constitution, and he asserts that his wife could not waive his constitutional rights by consenting to a search of their home.

[1-3] It is well settled, in both federal and state courts, that evidence obtained by unreasonable search and seizure is inadmissible. Fourth and Fifth Amendments to the United States Constitution; Article I, Section 15, North Carolina Constitution; G.S. 15-27; *Mapp v. Ohio,* 367 U.S. 643, 6 L.Ed. 2d 1081, 81 S.Ct. 1684; *State v. Colson,* 274 N.C. 295, 163 S.E. 2d 376. However, the constitutional protection claimed by defendant does not extend to all searches and seizures, but only to those which are unreasonable. Whether a search is unreasonable is determined

by the court upon the facts of each individual case. *State v. Robbins,* 275 N.C. 537, 169 S.E. 2d 858. It is also well settled that the constitutional guaranty against unreasonable searches and seizures does not prohibit a seizure of evidence without a warrant where no search is required. *United States v. Pate,* 324 F. 2d 934. *Cert. den.* 377 U.S. 937, 12 L.Ed. 2d 299, 84 S.Ct. 1341; *State v. Virgil,* 276 N.C. 217, 172 S.E. 2d 28.

Decision of this assignment of error requires that we first determine whether, under the facts of this case, there has been a search.

"The term 'search,' as applied to searches and seizures, is an examination of a man's house or other buildings or premises, or of his person, with a view to the discovery of contraband or illicit or stolen property, or some evidence of guilt to be used in the prosecution of a criminal action for some crime or offense with which he is charged. As used in this connection the term implies some exploratory investigation, or an invasion and quest, a looking for or seeking out. The quest may be secret, intrusive, or accomplished by force, and it has been held that a search implies some sort of force, either actual or constructive, much or little. A search implies a prying into hidden places for that which is concealed and that the object searched for has been hidden or intentionally put out of the way. While it has been said that ordinarily searching is a function of sight, it is generally held that the mere looking at that which is open to view is not a 'search.'" 79 C.J.S., Searches and Seizures, § 1, p. 775. Quoted in part in *State v. Smith,* 242 N.C. 297, 87 S.E. 2d 593.

[4] We find an abundance of authority supporting the proposition that when the evidence is delivered to a police officer upon request and without compulsion or coercion, there is no search within the constitutional prohibition against unreasonable searches and seizures.

The Supreme Court of Appeals of Virginia considered this question in the case of *Duffield v. Peyton,* 209 Va. 178, 162 S.E. 2d 915. There defendant was tried upon the charge of murder. He was convicted and the death penalty was imposed. His appeal was not duly perfected and he petitioned for a writ of *habeas corpus ad subjiciendum,* which was dismissed after a plenary hearing. On appeal to Supreme Court of Appeals of Virginia from dismissal of the writ of *habeas corpus,* one of

State v. Reams

his assignments of error was that clothes worn on the night of the homicide were introduced at his trial. Defendant contended this evidence was inadmissible because it was obtained as a result of an unreasonable search and seizure. The Court, finding no error in the admission of the clothing, stated:

"Before the reasonableness or legality of an alleged search may be questioned it is necessary to first determine whether there has actually been a search. 'A search ordinarily implies a quest by an officer of the law, a prying into hidden places for that which is concealed.' State v. Coolidge, 106 N.H. 186, 191, 208 A. 2d 322, 326. It implies 'some exploratory investigation, or an invasion and quest, a looking for or seeking out. * * * [I]t is generally held that the mere looking at that which is open to view is not a 'search.' " 79 C.J.S., Searches and Seizures § 1, pp. 775, 776.

"Here, there was no evidence that Detective Asaro and Cherry obtained entry into Duffield's home by intimidation or trickery. On the contrary they properly identified themselves to Mrs. Duffield as police officers and informed her that they wanted to ask Duffield 'a few questions about what happened last night.' The officers were invited into the house to await Duffield's arrival. As was said in Robbins v. MacKenzie, 1 Cir., 364 F. 2d 45, 49, 'We do not think that after a householder, who has been fully and honestly informed of the objectives of the police, makes a responsive gesture of invitation, the courts must engage in a psychological or physiological inquiry into whether the invitation was really meant.' While inside, Mrs. Duffield was merely asked if she knew what clothing her husband had worn the previous day. She was not requested to secure them. However, she voluntarily left the room alone and returned with Duffield's blue trousers and T-shirt for the officers to observe. The officers engaged in no exploration whatever, so the question of her consent to a search is not involved."

The case of State v. Coolidge, 106 N.H. 186, 208 A. 2d 322, is factually similar to instant case. There police officers dressed in plain clothes went to the home of Coolidge while investigating the murder of a young girl. They knocked on the door, identified themselves as police officers, and were invited in by defendant's wife. They informed Mrs. Coolidge that it was

possible that her husband would be detained at the station that evening, and told her that, as a part of their investigation of the murder, guns owned by various other persons had been taken for tests. She stated that they had four guns in the house. Defendant's wife went to the bedroom closet and got the guns. The officers "did not look into the closet or feel around" and looked in no other areas of the house except where they were invited. Defendant's wife also pointed out some of her husband's clothing and inquired if it might be something they were looking for, stating that she had no objection to their having them. The court held that the guns and clothes were not taken by search and seizure and, *inter alia,* stated:

> "A search ordinarily implies a quest by an officer of the law, a prying into hidden places for that which is concealed. A seizure contemplates forcible dispossession of the owner. *Weeks v. United States,* 232 U.S. 383, 397, 34 S.Ct. 341, 58 L. Ed. 652; *United States ex rel Stacey v. Pate,* 324 F. 2d 934, 935 (7th Cir. 1963); *People v. Woods,* 26 Ill. 2d 557, 188 N.E. 2d 1; *State v. Baron,* 106 N.H. 149, 207 A. 2d 447.
>
> . . . .
>
> "The evidence warranted the Trial Court's finding that 'there was no search by the police of the premises'; and that 'Mrs. Coolidge fully intended to cooperate with the police in every way and to furnish them freely with both information and guns in order, as she stated, to clear her husband of any suspicion.'
>
> "On the facts and circumstances of this case it is our opinion that the four guns and certain objects of defendant's clothing obtained from his residence on the night of February 2, 1964, by officers McBain and Glennon were not secured by search and seizure. On the contrary they were voluntarily shown and given to them by Mrs. Coolidge without coercion on their part and were taken away by the officers with her consent. Consequently they were not obtained in violation of the Constitution of our state or that of the United States and are not subject to being returned to the defendant and are admissible in evidence if found relevant and material at the trial."

The pertinent facts and holdings of the court in the case of *McCoy v. State,* 241 Ind. 104, 170 N.E. 2d 43, are found in the following paragraph:

"Appellant complains that certain exhibits (merchandise alleged to have been stolen) were obtained in violation of the constitutional right against search and seizure. The evidence shows that the police officers, standing on the porch of defendant's home at the time they were investigating the break-in at the Woolworth store, asked Max Allsup, the appellant's son, to get the merchandise out of his home and the appellant's home and give it to them. This he did. It appears first that there was no actual search of the home and that one of the occupants voluntarily turned over the exhibits to the police. In the law of searches and seizures, the term 'search' implies a prying into hidden places for that which is concealed. *McAdams v. State,* 1948, 226 Ind. 403, 81 N.E. 2d 671."

In the case of *United States v. Pate, supra,* petitioner was convicted of murder in the Illinois State Courts and after exhausting his state remedies petitioned the United States District Court to issue a writ of *habeas corpus.* The District Court dismissed his petition and he appealed to the United States Court of Appeals, 7th Circuit. The facts show that while petitioner was in custody as result of the murder investigation, the police noticed a spot on his T-shirt which appeared to be blood. He was questioned about the length of time he had worn the T-shirt, and during the questioning the officer told petitioner that he was going to send someone over to his house and prove he was lying. Petitioner replied, "Go ahead." Two officers went to petitioner's house and questioned his wife. She said he had changed shirts during the day, so the officers asked her to produce the shirt. When petitioner's wife asked if her husband had told officers to come and get the shirt, the officers answered in the affirmative. She gave them a blood-stained shirt, and when petitioner was confronted with the shirt, he confessed. On appeal he contended that the shirt was illegally obtained since his wife could not waive his constitutional right against unreasonable search and seizure. The Court rejected this contention and stated:

"Upon a review of all the evidence, we think petitioner's contention that the blood-stained shirt was obtained by an unlawful search of his house has no merit. Police officers went to the premises where incriminating evidence was found and were voluntarily given the shirt. Their action did

not constitute a search. It is of no consequence that the person who gave the police the blood-stained shirt was petitioner's wife.

"As was said in *Haerr v. United States,* 240 F. 2d 533, 535 (5th Cir. 1957), 'A search implies an examination of one's premises or person with a view to the discovery of contraband or evidence of guilt to be used in prosecution of a criminal action. The term implies exploratory investigation or quest.' Petitioner's privacy was not invaded; there was no inspection or examination of his household. Under these circumstances, we hold there was no search either in an actual or legal sense. *Cf. Lee v. United States,* 95 U.S. App. D.C. 156, 221 F. 2d 29 (1954); *Ellison v. United States,* 93 U.S. App. D.C. 1, 206 F. 2d 476 (1953)."

Accord: *State v. Morris,* 243 S.C. 225, 133 S.E. 2d 744, *cert. den.* 377 U.S. 1001, 12 L. Ed. 2d 1050, 84 S.Ct. 1935; *Irvin v. State,* 66 So. 2d 288 (Fla. 1953), *cert. den.* 346 U.S. 927, 98 L.Ed. 419, 74 S.Ct. 316; *State v. Quinn,* 111 S.C. 174, 97 S.E. 62, 3 A.L.R. 1500; *State v. Richberg,* 171 S.E. 2d 592 (S.C. 1969); *Ritter v. Commonwealth,* 210 Va. 732, 173 S.E. 2d 799.

[5] Our review of the record fails to reveal evidence that any of the officers involved in this case examined defendant's home or engaged in any exploratory quests implying coercion, intimidation or force, actual or constructive, which resulted in the challenged shotgun being delivered to them. Neither is there evidence of forcible dispossession. On the contrary, the shotgun was voluntarily displayed to officers by defendant's wife without any coercion on the part of the officers, and the shotgun was later freely delivered to an officer and taken away by him with her consent.

The evidence in instant case amply supports the trial judge's findings of fact, and the findings of fact in turn sustain his conclusions that "Mrs. Cammie Reams, wife of defendant, on February 27, 1970, voluntarily displayed the shotgun in question to officers Cameron and Holt, . . . that Mrs. Reams on February 28, 1970, . . . voluntarily delivered the shotgun to Officer Brown, . . . [and that] a search for the shotgun was not made by the officers."

We hold that there was no search involved when defendant's wife displayed the shotgun to Officers Cameron and Holt on February 27, 1970 or when she delivered it to Officer Brown on February 28, 1970.

Defendant's principal citation of authority is *State v. Hall,* 264 N.C. 559, 142 S.E. 2d 177. *Hall* differs factually from instant case in that the officers admittedly performed an actual search of defendant's home without a warrant with the consent of his wife while defendant was in jail. The search yielded property which had been stolen, and the officers obtained a confession from defendant when he was confronted with the stolen property. At the defendant's trial the property recovered from his home and his confession were admitted into evidence. The holding of the court in *Hall* places North Carolina in the line of authority which holds that the wife's consent to search husband's home does not waive husband's constitutional right to be secure from unlawful search and seizure. However, *Hall* does not control decision in instant case since here we hold that there was no *search* involved in obtaining the shotgun. Therefore the question of consent to search by the wife is not reached.

The trial judge properly denied defendant's motion to suppress the evidence relative to the shotgun.

Defendant's remaining assignment of error is that the trial judge erred in submitting the charge on first degree murder to the jury.

**[6-7]** "Murder in the first degree is the unlawful killing of a human being with malice and with premeditation and deliberation." Strong's N.C. Index, Vol. 4, Homicide, § 4, p. 194; *State v. Robbins, supra.* When the defendant admits or the State satisfies the jury beyond a reasonable doubt that the defendant intentionally used a deadly weapon and thereby proximately caused the death of a human being, the law raises presumptions that the killing was unlawful and that it was done with malice. Such unlawful killing of a human being with malice is murder in the second degree. *State v. Cooper,* 273 N.C. 51, 159 S.E. 2d 305. However, no presumption as to premeditation and deliberation arises from a killing proximately caused by the intentional use of a deadly weapon. *State v. Propst,* 274 N.C. 62, 161 S.E. 2d 560.

**[8]** Premeditation means "thought beforehand for some length of time, however short." *State v. Benson,* 183 N.C. 795, 111 S.E. 869.

**[9]** "Deliberation means that the act is done in cool state of blood. It does not mean brooding over it or reflecting upon it for a week, a day or an hour, or any other appreciable length of

time, but it means an intention to kill, executed by the defendant in a cool state of blood, in furtherance of a fixed design to gratify a feeling of revenge, or to accomplish some unlawful purpose, and not under the influence of a violent passion, suddenly aroused by some lawful or just cause or legal provocation." *State v. Benson, supra.*

[10, 11] Premeditation and deliberation may be inferred from a vicious and brutal slaying of a human being. *State v. Stanley,* 227 N.C. 650, 44 S.E. 2d 196. Also, evidence of threats against the victim are admissible in evidence to show premeditation and deliberation, *State v. Faust,* 254 N.C. 101, 118 S.E. 2d 769; *State v. Moore,* 275 N.C. 198, 166 S.E. 2d 652.

[12] Here, the State offered evidence tending to show that the body of the victim was found lying in the street and that her death was caused by shock and hemorrhage resulting from a shotgun blast that removed part of her lower face; that three spent shell casings were found near the body which were ejected from the gun later found at defendant's home; that defendant had been seen with the victim near the place where her body was found just a few minutes before the shooting. Further, the State offered evidence that on Friday preceding the victim's death defendant stated, "I am going to kill her (Loretta Mae Bratcher) if it is the last thing I am going to do. I am going to kill her if I have to go in Anna Bratcher's house and get her."

There is ample evidence from which the jury could find that defendant, O'Neal Reams, unlawfully killed Loretta Mae Bratcher with malice and with premeditation and deliberation.

The trial judge correctly submitted the issue of murder in the first degree to the jury.

In the trial below we find

No error.