## Staunton

LOREN NEAL DUFFIELD v. C. C. PEYTON, SUPERINTENDENT OF THE VIRGINIA STATE PENITENTIARY.

September 6, 1968.

Record No. 6869.

Present, Eggleston, C.J., Buchanan, Snead, Carrico, Gordon and Harrison, JJ.

O. *Eugene Pinion* for plaintiff in error.

*Reno S. Harp, III, Assistant Attorney General (Robert Y. Button, Attorney General,* on brief), for defendant in error.

SNEAD, J., delivered the opinion of the court.

Loren Neal Duffield, petitioner, appealed from an order of the Corporation Court of the City of Norfolk entered September 29, 1966 wherein his petition for a writ of *habeas corpus ad subjiciendum* filed against C. C. Peyton, Superintendent of the Virginia State Penitentiary, respondent, was denied and dismissed after a plenary hearing had on June 7, 1966.

Duffield was and is now being detained by respondent pursuant to a judgment order of the Corporation Court of the City of Norfolk entered January 7, 1964 which, in accordance with the jury verdict, sentenced him to death on a conviction of murder in the first degree.

Duffield makes five assignments of error. He contends that the court erred in holding: (1) that certain evidence introduced by the Commonwealth at the original trial was admissible and had not been obtained as a result of an unlawful search and seizure; (2) that his confession was voluntary; (3) that his constitutional rights were not violated when he was not afforded counsel at the preliminary hearing; (4) that he had not been denied effective assistance of counsel, and (5) that he was not denied the right of appeal.

The evidence discloses that on the night of March 4, 1963, Duffield, then age 23, made a false report to the Norfolk police stating that he had been robbed. He testified that he did so because he was "trying to explain scratches on my face." The next day Detectives Mario Asaro and William Cherry investigated a report that Gwen-

dolyn Padgett, age 14, had failed to return home from a baby-sitting engagement on the evening of March 4 and was a missing person. At approximately 4 p.m. on March 5 the officers went to Duffield's home without a search warrant. They identified themselves as police officers to Mrs. Duffield, petitioner's wife, and told her that they wanted to ask Duffield " 'a few questions about what happened last night' ". Upon being advised that her husband was not at home but expected shortly, the officers asked if they could wait for him. At Mrs. Duffield's invitation the officers entered the premises and remained in the living room. She was asked whether she knew what Duffield wore on the previous day, whereupon she left the room alone and returned with a pair of blue trousers and a white T-shirt belonging to Duffield. According to Detective Asaro, she was not requested to produce them.

Duffield arrived home from work about 4:30 p.m. The officers met him in the front yard, identified themselves, and told him that they would like " 'to talk with him downtown about what happened last night' ". Duffield testified that the officers had the trousers and T-shirt in their possession at the time they met him. However, both officers stated that they were left on the settee in the living room. Duffield admitted to the officers that the clothing belonged to him. He was asked if he had any objection to its being taken to police headquarters and he replied that he had none. He also agreed to drive his own car to headquarters so that he would have "a way back". Detective Asaro accompanied him, and Detective Cherry followed in the police car.

Upon arrival at police headquarters around 5 p.m. Duffield consented to being placed in a line-up. Major Padgett, the victim's brother, who had accompanied his sister to the car which was to take her to the home where she was to baby sit, was not sure Duffield was the person to whom she was delivered. Duffield was then asked to put on the trousers and T-shirt that were brought from his home to the police station. He agreed to do so, and when Major Padgett walked in the room he identified Duffield as the man who " 'took my sister' ". At that time the police were not aware of the fact that Gwendolyn Padgett had been raped and murdered.

Following this identification, Duffield testified that he was questioned by several police officers who used "harsh tones"; that one of them "shook his fist in my face"; that later he was taken into another room where Detective C. F. Sanders, Jr. talked to him alone. He

said that Sanders "treated me in a very kind way, just like a father, and he talked to me in a nice tone, and I admitted the crime to him". (Murder and rape.) He further stated that prior to his confession he was not advised by anyone of his right to have counsel.

Detective Sanders testified that no one shook his fist at Duffield; that he was advised of his right to have counsel present, to remain silent, and to use the telephone if he so desired; that Duffield was then asked " 'where he had taken the girl?', and he thought for approximately three or four minutes at the most, and at that time he hung his head down, and said 'all right, I'll take you to where she is' ". Duffield then rode with and directed the police officer to the spot where he had hidden the body of Gwendolyn Padgett. Upon their return to police headquarters he signed a confession stating that he had raped and murdered Gwendolyn Padgett. Thereafter, warrants were issued and served upon Duffield charging him with the crimes of rape, murder and grand larceny.

A preliminary hearing was had the next day, March 6. Duffield said that he waived the preliminary hearing on the advice of Captain (now Inspector) Charles D. Grant. However, Grant testified that he gave Duffield no advice concerning a waiver of his preliminary hearing. On April 1, the grand jury returned indictments charging Duffield with, among other offenses, murder.

Prior thereto, on March 16, the trial judge requested William H. Sands, an attorney, to accept appointment as Duffield's counsel. Sands told the judge that he would like to have an opportunity to check into the case before accepting. On the same day he conferred with Duffield, who was in the city jail, for more than an hour. Later he had conferences with Duffield's parents, his wife and brother. Sands was instrumental in having Dr. Robert H. Thrasher, a psychiatrist, examine Duffield. After Sands received Dr. Thrasher's report he moved the court on April 3 to commit Duffield to the Southwestern State Hospital at Marion for mental observation. The record is not clear as to the exact date Sands was formally appointed as counsel for Duffield, but it does show that it was prior to the time the motion to commit was made and granted.

The Superintendent and the Clinical Director of the hospital reported to the court by letter, dated June 4, 1963 that Duffield had not been psychotic or insane since his admission; that he was mentally competent to testify in his own defense, and that based upon the history obtained and their examination he was mentally capable of

knowing right from wrong on March 4, the date Gwendolyn Padgett was murdered.

At the trial on the indictment charging murder, which commenced on September 25, Duffield pleaded not guilty by reason of insanity. According to Sands, it was Duffield's desire to enter such a plea, to be tried by a jury, and not to testify. After the jury returned a verdict finding him guilty of murder in the first degree and fixing his punishment at death, Sands, Duffield's court-appointed attorney, moved to set the verdict aside and grant a new trial on the grounds that the verdict was contrary to the law and the evidence. Argument on the motion was continued to January 7, 1964, at which time the motion was overruled and Duffield was sentenced in accordance with the verdict. Sands excepted to this action of the court, and on his motion execution of the judgment was postponed so that a writ of error could be applied for.

Sands testified that he did not recall discussing an appeal with Duffield between September 26, 1963, the date of conviction and January 7, 1964, the date of sentence. He did state, however, that Duffield had previously told him "a half dozen times" that he did not want to appeal and "didn't care". He further testified: "As far as I was concerned, I was his appointed counsel, and my services had been concluded by the Court".

On January 7, 1964, Sands wrote a letter to Duffield's parents and mailed copies of it to Duffield, his wife and brother. It reads:

" 'I have just returned from Court where the motion to set aside the verdict of the jury, on the ground that it was contrary to the law and evidence, was argued.

" 'As I anticipated, the Court listened very intently but overruled the motion and pronounced sentence. I then asked for a sixty day stay of execution in order to notify the family so that they might have time for any further proceedings, if desired, and the Court then fixed the execution date for March 29, 1964.

" 'This concludes my services as appointed attorney, and if there is any desire on your part to note an appeal or any other procedure, it will, of course, be necessary for you to employ private counsel.' "

In his first assignment of error, Duffield claims that his blue trousers and T-shirt were inadmissible in evidence because they were obtained by an illegal search and seizure.

Before the reasonableness or legality of an alleged search may be questioned it is necessary to first determine whether there has actually

been a search. "A search ordinarily implies, a quest by an officer of the law, a prying into hidden places for that which is concealed." *State* v. *Coolidge*, 106 N.H. 186, 191, 208 A.2d 322, 326. It implies "some exploratory investigation, or an invasion and quest, a looking for or seeking out. * * * [I]t is generally held that the mere looking at that which is open to view is not a 'search' ". 79 C.J.S., Searches and Seizures, § 1, pp. 775, 776.

Here, there was no evidence that Detectives Asaro and Cherry obtained entry into Duffield's home by intimidation or trickery. On the contrary they properly identified themselves to Mrs. Duffield as police officers and informed her that they wanted to ask Duffield "a few questions about what happened last night". The officers were invited into the house to await Duffield's arrival. As was said in *Robbins* v. *McKenzie*, 364 F.2d 45, 49, "We do not think that after a householder, who has been fully and honestly informed of the objectives of the police, makes a responsive gesture of invitation, the courts must engage in a psychological or physiological inquiry into whether the invitation was really meant". While inside, Mrs. Duffield was merely asked if she knew what clothing her husband had worn the previous day. She was not requested to secure them. However, she voluntarily left the room alone and returned with Duffield's blue trousers and T-shirt for the officers to observe. The officers engaged in no exploration whatever, so the question of her consent to a search is not involved.

In *State* v. *Coolidge, supra,* police officers visited the residence of Coolidge for the purpose of investigating a murder of a young girl. Coolidge's guns and clothing were voluntarily shown and given to the officers by his wife without coercion and were taken from the premises with her consent. The court held, among other things, that the articles were not obtained by search and seizure, and that no constitutional rights were violated. See also *United States* v. *Pate*, 324 F.2d 934.

"A seizure contemplates forcible dispossession of the owner." *State* v. *Coolidge, supra.* Here, there was no forcible dispossession. The police officers simply asked Duffield if they might take his clothing with them to headquarters and he readily agreed.

We therefore hold that the articles of clothing in question were not obtained by illegal search and seizure, and that they were properly admitted into evidence.

■ Duffield further contends that the trial court erred in holding that his confession was voluntary.

It will be observed that Duffield's trial was had before the decisions were rendered in *Escobedo* v. *Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 and *Miranda* v. *Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. In *Johnson* v. *New Jersey*, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed. 2d 882, the court ruled that these decisions were to be applied prospectively. Hence, the strict principles enunciated therein are not applicable here.

The record shows that after Duffield was identified by the victim's brother he was questioned by several police officers. Duffield testified that they used "harsh tones" and one of them "shook his fist" in his face. This was denied by Detective Sanders. In any event no confession was elicited at this time. Duffield made the confession later when he and Sanders were alone in another room for a short period of time. He does not assert that Sanders threatened, mistreated or abused him in any way. On the contrary he testified that Sanders "treated me in a very kind way, just like a father * * *": Sanders stated that before he interrogated Duffield he advised him of his right to have counsel present, to remain silent, and to use the telephone. After directing the police officers to the victim's body, he was returned to headquarters. He was again told of his rights before signing a statement confessing to the rape and murder of Gwendolyn Padgett.

There was ample evidence to support the trial court's finding that Duffield's confession was voluntary under the test applicable at the time of his trial, and the court did not err in admitting the confession into evidence.

■ Duffield's contention that his constitutional rights were violated when he was not afforded counsel at the preliminary hearing is without substance. The preliminary hearing in this State is procedural and not jurisdictional. *Snyder* v. *Commonwealth*, 202 Va. 1009, 1014, 121 S.E.2d 452, 456. Such a hearing is not a critical stage of the proceedings which would require the benefit of counsel. *Vess* v. *Peyton*, 352 F.2d 325; *Peyton* v. *Ellyson*, 207 Va. 423, 428, 150 S.E.2d 104, 108. The fact that the potential penalty is death for the offense here involved does not change the procedural character of the preliminary hearing so as to make it a critical stage.

■ We proceed next to a consideration of Duffield's fourth as-

signment of error, wherein he claims that the court below erred in not holding that he had been denied effective assistance of counsel.

Duffield concedes in his brief that Sands "is a very able attorney and has had many years of experience in trying appointed cases". However, he argues that he was not afforded effective representation by Sands because (1) he did not object to the introduction in evidence of the blue trousers and T-shirt "which were seized illegally"; (2) he did not ascertain whether the confession was voluntarily made and object to its introduction, and (3) he failed to explain to Duffield his right of appeal as an indigent.

Under the evidence there were no valid grounds upon which counsel could have objected to the introduction in evidence of Duffield's blue trousers and T-shirt. As we have hereinabove said they were not obtained by an illegal search and seizure. Mrs. Duffield voluntarily left the living room where the officers were seated and returned with the clothing without having been requested to do so. Moreover, Duffield agreed that the officers could take the clothes to headquarters.

The record shows that on July 29, 1963 Duffield furnished Sands a memorandum in his own handwriting stating in detail the contents of the confession he signed at headquarters on March 5, 1963. In substance, the two papers are similar. From this statement and his communications with Duffield, Sands had no reason to suspect that the confession was anything but voluntary, and Duffield in no way indicated to Sands that it was otherwise. Under the facts in this case, we cannot say that counsel was ineffective because he did not object to the introduction of the confession.

Duffield also claims that Sands was ineffective because he failed to explain to him his right of appeal as an indigent. We do not agree. First, such failure does not affect the fairness of a trial itself. It cannot be said that Duffield was denied a fair trial by ineffective assistance of counsel on the basis of an omission by counsel after the conclusion of the trial. Second, we cannot say that Sands' omitting to explain to Duffield his right to an appeal amounted to a denial of effective representation in the face of his repeated statements expressly indicating that he did not want to appeal.

The court below found that Duffield "had competent, effective, and experienced counsel" during the trial of his case. The record supports this finding. It shows that Sands investigated the charge, had numerous conferences with Duffield and members of his family,

employed an independent psychiatrist, and conducted a carefully planned defense on behalf of his client.

Finally, Duffield's main contention is that he was denied the right of an appeal.

It is well settled that a defendant in a felony case has a right to petition for an appeal, and that he is entitled to court-appointed counsel to assist him if he is indigent. *Cabaniss* v. *Cunningham*, 206 Va. 330, 333, 143 S.E.2d 911, 913. Duffield testified that no one discussed an appeal with him, but Sands said that Duffield told him on several occasions that he did not want to appeal. However, on January 7, 1964, the date that Duffield's motion to set aside the verdict was overruled and sentence was pronounced, Sands wrote a letter to Duffield's parents sending copies of it to Duffield, his wife and brother. The letter reads in part:

"This concludes my services as appointed attorney, if there is any desire on your part to note an appeal or any other procedure, *it will, of course, be necessary for you to employ private counsel*". (Italics supplied.)

Sands undertook to give advice in the event an appeal was desired and in so doing misinformed Duffield. While we have indicated there is no duty on counsel or the court to inform every defendant in a criminal case after conviction of his right to an appeal in the absence of an indication one is desired (*Peyton* v. *Webb*, 207 Va. 417, 422, 149 S.E.2d 889, 892), this is not to say there is no duty not to misinform him, thereby causing him to believe he has no right to appeal unless private counsel is employed. It was not necessary for Duffield, an indigent, to employ private counsel in order to perfect his appeal. He was entitled to have the court appoint counsel for him. Certainly, Duffield, who had received the death penalty, had the right to change his mind and seek an appeal. Under the terms of Sands' letter he could not do so unless he employed private counsel. In view of this misinformation by his court-appointed counsel we are of opinion that Duffield was in effect denied his right to appeal and is entitled to have counsel appointed to file a delayed petition for appeal.

Accordingly, we vacate the order of September 29, 1966 denying and dismissing the petition for a writ of *habeas corpus* and remand the case to the court below with direction to appoint counsel to assist Duffield in applying for an appeal from his conviction of murder. It appearing that a transcript is available, court-appointed counsel

shall submit it for approval and certification by the trial court within a reasonable time, not exceeding sixty days after the appointment of counsel. Upon certification of the transcript, Duffield's attorney shall be furnished a copy thereof and of any other relevant parts of the record he may desire. Counsel shall then prepare and present a petition for appeal to this court, or to one of its justices, in the manner provided by law.

If these procedures are not complied with, Duffield shall promptly be granted a new trial or be released from further custody. *Stokes* v. *Peyton*, 207 Va. 1, 6, 147 S.E.2d 773, 777; *Russell* v. *Peyton*, 207 Va. 469, 473, 150 S.E.2d 530, 533.

*Reversed and remanded.*