## Richmond

HAROLD EDWARD RITTER, JR. v. COMMONWEALTH OF VIRGINIA.

April 27, 1970.

Record No. 7159.

Present, All the Justices.

*Henry L. Lam* (*Lam, Hudgins and Mann*, on brief), for plaintiff in error.

*Walter H. Ryland, Assistant Attorney General* (*Robert Y. Button, Attorney General*, on brief), for defendant in error.

HARRISON, J., delivered the opinion of the court.

Harold Edward Ritter, Jr., defendant, seeks to reverse a judgment entered by the Circuit Court of the City of Virginia Beach on July 25, 1968, finding him guilty of possession of a narcotic drug (marijuana) in violation of Virginia's Uniform Narcotic Drug Act, and sentencing him to three-year term in the penitentiary.

On January 31, 1968, Sgt. L. O. Sutton obtained a search warrant for the residence of Harold E. Ritter, 1400 East Bay Shore Drive, Virginia Beach, Virginia. Defendant, then an eighteen-year-old student at First Colonial High School, resided in this dwelling with his parents. The dwelling was searched, and no drugs were found.

The officers had noted the delivery and deposit by the postman of a package in the Ritter mailbox and questioned Mrs. Harold E. Ritter, mother of defendant, as to any package that defendant may have received. Sgt. Sutton testified that, after being told by Mrs. Ritter that she had not collected the mail for this particular day, "[W]e walked out to the mailbox and she removed the mail from the box and handed me this package addressed to the defendant". On cross-examination Sutton elaborated as follows:

> "I asked her at the house had she checked the mail that day and, as I recall, we didn't ask her for it. She found the package, she saw it, obviously knowing there was such a package there, and I am not certain whether we were in the driveway or actually at the box whenever she handed it to us. I am sure we were at least as far from here to this doorway away from the box at the time she handed it to us. Whether we were back up in the driveway or not, I am not certain."

The wrappings on the package showed that it was sent from Cocoa Beach, Florida, marked "First Class Mail", and addressed to Eddie Ritter, 1400 East Bay Shore Drive, Virginia Beach, Virginia.

After receiving the package from the mother, Sgt. Sutton went to the First Colonial High School where defendant and numerous other students were being interviewed by police officers investigating narcotic violations. Defendant had not been questioned at that time.

Ritter was taken into an office at the school and was told that he was being interviewed "in reference to his violation of the narcotic drug laws". Before being asked any questions, defendant was fully advised of his constitutional rights. He indicated that he understood, signed the "legal rights interview form" and agreed to make a statement. The form which he signed recites that the interview was "in connection with the alleged commission of the crime of Possession of Narcotic Drugs".

Sutton then handed to Ritter the unopened package which had been concealed beneath the officer's coat and asked defendant to open it. The officer either gave Ritter his knife, or assisted him by clipping the binding tape.

Defendant opened the package and viewed its contents. Sutton asked him: "What is this?" and defendant replied: "It's pot."

When asked who sent it, defendant replied that any of 200 people could have sent it to him. His attention was directed to the Cocoa Beach, Florida postmark, and Ritter said that any of 50 people could have sent it to him from there; that he could have mentioned to anyone that he wanted some marijuana and they could have sent it to him whenever they came in contact with it.

After identifying the contents of the package as "pot", the "jargon" of drug users for marijuana or Cannabis Sativa L., Ritter was asked if it were his. Defendant's answer was: "It must be mine, it's got my name on it."

Ritter was then advised that he was under arrest for possession of marijuana. He was searched, and the officers found in his wallet a money order receipt from the Western Union Telegraph Company for $42.50 ($40 plus $2.50 charges). The receipt shows that on January 24, 1968, Eddie Ritter, of 1400 East Bay Shore Drive, Virginia Beach, Virginia, sent $40 to Gary Price, 220 Lincoln Avenue, Apt. B-10, Cape Canaveral, Florida, a city testified to be contiguous to Cocoa Beach.

Defendant was questioned as to his use and knowledge of mari-

juana in the Virginia Beach area. Sutton said he was cooperative and showed him four or five different fields or places where he knew that marijuana was growing.

The contents of the package were taken by Sutton to the Crime Laboratory in the City of Norfolk and analyzed in his presence. A copy of the official laboratory report was introduced in evidence. It is dated January 31, 1968, signed by Heinz H. Karnitschnig, M. D., Deputy Chief Medical Examiner, and Ramon A. Morano, M. S. C., State Toxicologist. The report shows the substance submitted to be "loose weed for identification" which analyzed as "weed (30.5 Gms.): identified to be cannabis (marihuana)."

Evidence was adduced to show that 30.5 grams of cannabis would have a price range from $25 to $50, depending on the area it came from, the demand and the supply.

Sgt. Sutton was the only witness for the Commonwealth. Defendant did not testify and called only one witness in his behalf—Gary Price.

Price, a resident of Virginia Beach, was attending college in Florida in January, 1968, and admitted receiving from Eddie Ritter a money order for $40.

He testified that following the receipt of a letter from defendant, he phoned the latter and Ritter asked him to purchase some beads and a bracelet for his girl friend; that during the course of their conversation, Price requested payment of a $20 loan made defendant in July, 1967; and that Ritter agreed to send this and $20 more for the beads and bracelet.

This witness said that he could not get the bracelet but did obtain the beads, for which he paid "around $10" and figured "it was worth $10 to get them".

Price further testified that a package containing the beads, together with an accompanying letter, was sent to Ritter "around the end of January or the beginning of February, something like that. I can't remember exactly". He denied sending marijuana to defendant, but admitted knowledge of this drug, saying: "I have an idea what it is. I mean, I have heard." When asked if his associates "didn't try to sell it, push it or give it away", Price responded that "he did not know, that he did not look into it, and that it was not any of his business".

Defendant contends that the package containing the marijuana was not lawfully obtained by the officers, and therefore should not have been admitted in evidence. We disagree.

The evidence before us shows that there was no search of the mailbox by the officers or seizure of the package by them. The mailbox was opened by the mother of defendant, and a package addressed to him was freely and voluntarily given by her to the officers. There is no evidence that they threatened Mrs. Ritter, used any force or exercised any coercion to induce her to deliver the package.

Defendant cites *Bumper* v. *North Carolina*, 391 U. S. 543, 88 S. Ct. 1788, 20 L. ed. 2d 797 (1968). There the officers represented to defendant's grandmother, who was in possession of the premises, that they had a search warrant. A search was conducted, and a rifle was found which was subsequently introduced in evidence. At a hearing on a motion to suppress, the prosecutor did not rely on a warrant to justify the search but on consent given by the grandmother. The court held:

> "When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority. A search conducted in reliance upon a warrant cannot later be justified on the basis of consent if it turns out that the warrant was invalid. The result can be no different when it turns out that the State does not even attempt to rely upon the validity of the warrant, or fails to show that there was, in fact, any warrant at all.
>
> "When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent." 391 U. S. 543, 548, 549, 550, 88 S. Ct. 1788, 1792, 20 L. ed. 797, 802, 803.

Ritter does not claim that the officers searched the mailbox. He does not assert that the delivery of the package to the officers by his mother was because of coercion by them on her knowledge that they had a search warrant for the Ritter residence. The mother was not called as a witness. Sgt. Sutton's testimony that the mother "obviously" knew there was a package in the mailbox went unchallenged.

Defendant's position is that the home of his parents is also "his home" and that the mailbox is the "joint property" of all parties in the family. He argues that no member of his family could have surrendered the package, voluntarily or otherwise. He says it could have been obtained from the mailbox only by a search warrant. The record reveals that when the admissibility of the package was being argued, in the court below, counsel for defendant made the following representation to the trial court:

"The mail that comes there—now, we are not arguing the facts, but I am sure Mrs. Ritter takes his mail in the house all the time. *The question we are arguing here is the question whether she has the right to give his mail away to someone else. This is the point.* And the Rees case, I think, is conclusive [of] the fact that she does not. It is on that basis that I would move that without the search warrant for the mailbox, and with the ruling in the Rees case, that the evidence that was gotten out of the mailbox would be inadmissible." [Emphasis supplied.]

*Rees* v. *Commonwealth*, 203 Va. 850, 127 S. E. 2d 406 (1962), does not support the proposition relied upon by Ritter. There the residence searched was occupied exclusively by the parents of defendant. The evidence showed that Rees was a mature man who was not a regular occupant of his parents' home and that no room or quarters there were assigned him. Here we have a defendant, a son of high school age, living with his parents, in their residence—a home completely and exclusively under their control. In *Rees* we reviewed a number of cases discussing the effect of a parent's consent on the legality of a search and seizure, and as follows:

" 'A number of courts have considered the effect of a parent's consent on the legality of a search and seizure. In *Morris* v. *Commonwealth*, 306 Ky. 349, 208 S. W. 2d 58 (1948) the defendant was charged with murder. A cartridge case was found in the defendant's home. The father consented to a search of the house in which the defendant lived. The evidence was found in the kitchen which was under control of the father. The Court held that consent given by the head of the house, or the person in charge of the house, renders competent the evidence.

" 'In *People* v. *Galle*, 153 Cal. App. 2d 88, 314 P. 2d 58 (1957) the defendant's mother, at the request of the police, consented to

a search of her home. The officers found narcotics in her son's coat pocket. The Court held that the evidence was admissible.

" 'In *Tomlinson* v. *State*, 129 Fla. 658, 176 So. 543 (1937) an officer told the defendant's father they would like to go in his son's room. The father consented. The officer found a pair of shoes. These were properly admitted in evidence.

" 'In *State* v. *Hagan*, 47 Idaho 315, 274 P. 628 (1929) a mother consented to the search of a barn on her premises. There the officers found stolen property. The Court held that the evidence was admissible since the search was not unreasonable.

" 'In *United States* v. *Walker*, 190 F. 2d 481 (2d Cir. 1951) *cert. denied*, 342 U. S. 868 (1951) a motion was made to suppress evidence obtained in a search of defendant's luggage while he was in jail. The luggage was seized and searched in a hotel room of a woman who thought she was the defendant's wife. The agents' entry and search was by her consent. The court held the motion to suppress the evidence thus obtained was rightfully denied for the defendant had no right to object to the search of premises not occupied by him nor to the seizure of property not within his possession.

" 'In *Woodard* v. *United States*, 102 App. D. C. 393, 254 F. 2d 312 (1958) *cert. denied*, 357 U. S. 930 (1958) a householder took in without rent two boys, one of whom was her grand-nephew. She discovered among other articles several guns. She called the officers and invited them to search. It was held that this search was not unreasonable.' " 203 Va. 850, 865, 866, 127 S. E. 2d 406, 417.

In *Duffield* v. *Peyton*, 209 Va. 178, 183, 162 S. E. 2d 915, 919 (1968), will be found the following:

"In *State* v. *Coolidge, supra*, [106 N. H. 186, 208 A. 2d 322] police officers visited the residence of Coolidge for the purpose of investigating a murder of a young girl. Coolidge's guns and clothing were voluntarily shown and given to the officers by his wife without coercion and were taken from the premises with her consent. The court held, among other things, that the articles were not obtained by search and seizure, and that no constitutional rights were violated. See also *United States* v. *Pate*, 324 F. 2d 934."

The issue before us is whether the officers "lawfully obtained"

the package of marijuana by reason of its free and voluntary surrender to them by the mother of defendant, an unemancipated son.

The mother had a legal right to remove the contents from the box. The package was an appropriate object of a lawful seizure, and under the facts in this case an appropriate object to be voluntarily surrendered by the mother who was in lawful control thereof.

Defendant complains of the admission into evidence of the money order receipt. We have held repeatedly that a search of a defendant's person incident to a lawful arrest is proper. See *Jordan* v. *Commonwealth*, 207 Va. 591, 151 S.E.2d 390 (1966) and authorities cited therein. The money order receipt was found in the wallet of defendant after his lawful arrest and incident to a lawful search of his person. It possessed evidentiary value and was properly admitted.

Prior to questioning defendant with reference to his alleged violation of the narcotic drug law, he was given the full warnings required by *Miranda* v. *Arizona*, 384 U. S. 436, 86 S. Ct. 1602, 16 L. ed. 2d 694 (1966). Admittedly these were given before the package containing the marijuana was exhibited to him. The officers were under no obligation to produce the package, or otherwise divulge their background investigation, before giving the warnings. As pointed out by the Attorney General, most certainly their failure to tell the defendant that they had the package could not have in any way induced him to make a statement.

No affirmative act of fraud or deceit, or other improper conduct, is properly chargeable to the officers, and neither is there any evidence of entrapment, as is argued by defendant. They did nothing to procure, induce or incite the commission of a crime by him. The mere fact that the officers suspected that the package contained marijuana, when it was handed to Ritter, does not constitute entrapment. At that time the package had already reached its destination and had reposed in a mailbox used by the Ritter family. The fact that his mother and the police officer were the conduits through which defendant received physical possession of his package in no way taints the delivery or the officer who made it. The package had been removed from the mailbox by one having the lawful right to collect and remove mail addressed to members of the family.

A copy of the report from the office of Virginia's Chief Medical Examiner showing the analysis of the contents of the package, as containing 30.5 Gms. of Cannabis (marijuana) was received into evidence in accordance with Code § 19.1-45.

This copy was properly admitted, and no proof of the official connection of the persons whose names were signed thereto was necessary. Had defendant desired the opportunity to question the individuals as to the basis or nature of their findings, they should have been summoned as witnesses, and this he did not do.

In *Rodgers* v. *Commonwealth*, 197 Va. 527, 531, 90 S. E. 2d 257, 260 (1955), we said that an analysis made by an official in the regular course of his duties is presumed to be properly made. We have also held that a statute which authorizes the admission of documentary evidence is not violative of defendant's rights, and applies to reports of the state chemist. *Bracy* v. *Commonwealth*, 119 Va. 867, 89 S. E. 144 (1916).

Defendant further contends the evidence was insufficient to prove the contents of the package to be in fact a narcotic drug, defined by Code § 54-487 (19).[1] This assignment of error is without merit. The deputy state medical examiner and the toxicologist certified the results of the analysis made of the contents (loose weed) of the package as "weed (30.5 Gms.): identified to be (Cannabis) marihuana".

This certification could not have been made had the analysis not shown the substance to be within the statutory prohibitions. The definition of cannabis does not refer to or include the mature stalk, seeds incapable of germination, and other exemptions. When a medical examiner reports that the substance examined is cannabis, that means the prohibitive portions of the plant, "Cannabis Sativa L.", and not the excepted part of the plant.

Virginia Code § 54-514 expressly provides that in any indictment brought for the enforcement of any provision of the Uniform Narcotic Drug Act, it shall not be necessary to negative any exception or exemption contained in this article, and the burden of proof of any such exception or exemption shall be upon the defendant. *Baldwin* v. *Commonwealth*, 203 Va. 570, 125 S. E. 2d 858 (1962). Ritter made no effort to challenge the validity of the analysis, as was his duty if he desired to bring himself within the exception.

---

1. " '*Cannabis*' means and includes all parts of the plant Cannabis Sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds, or resin; but shall not include the mature stalks of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of such plant which is incapable of germination."

■ Defendant's principal assignment of error questions the sufficiency of the evidence to prove that he was in possession of a narcotic drug.

In order to convict a defendant of "possession" of a narcotic drug, within the meaning of Virginia's Uniform Narcotic Drug Act, it generally is necessary to show that defendant was aware of the presence and character of the particular substance and was intentionally and consciously in possession of it. Physical possession giving the defendant "immediate and exclusive control" is sufficient. However, the possession need not always be exclusive. The defendant may share it with one or more. The duration of the possession is immaterial and need not always be actual possession. The defendant may be shown to have had constructive possession by establishing that the drugs involved were subject to his dominion or control. See 91 A. L. R. 2d 810 for annotation on "What constitutes 'possession' of a narcotic drug", and a collection of cases.

In *People* v. *Pigrenet*, 26 Ill. 2d 224, 186 N. E. 2d 306 (1962), the court held that while knowledge was an essential ingredient in the crime of possession of narcotics, such knowledge may be proved by evidence of acts, declarations or conduct of the accused from which the inference may be fairly drawn that he knew of the existence of narcotics at the place where they were found.

We apply these principles to the instant case. The facts that are admitted, or conclusively established, are that a package of marijuana was sent defendant through the mails from Cocoa Beach, Florida. It was delivered by the postal authorities by its deposit in a mailbox used by defendant and other members of his family, incident to their occupancy of the family residence. The package was removed from the mailbox by the mother of defendant and given to a police officer, who, in turn, delivered it to Ritter. After coming into defendant's physical possession, the package was opened and its contents promptly recognized and identified by him for what it was—"pot" or marijuana.

There was evidence from which the trial judge could have inferred that the marijuana was procured for defendant by his friend, Gary Price. Ritter sent $40 to Price on January 24, 1968, that amount being the approximate cost of the quantity of marijuana which the package contained. Seven days after the dispatch of the money order, the marijuana was received by defendant.

The trial court had the opportunity to observe Price and to evaluate his testimony. His explanation of the transaction was vague and unsatisfactory. Price admitted a familiarity with marijuana and with individuals who used it. The beads that allegedly were purchased by him for defendant, from a portion of the proceeds of the money order, were not introduced in evidence. The girl friend who supposedly received the beads was not called as a witness. The court could have concluded that the dispatch of the money order and the receipt of the marijuana were not mere coincidences, involving the repayment of a debt and the purchase of beads, but rather were part of a transaction between friends involving the purchase of a narcotic drug.

Defendant evidenced no surprise over the receipt of the package or that it contained marijuana. When asked who sent it, he admitted that any of 200 people might have done so; and further acknowledged knowing approximately 50 people in Cocoa Beach, Florida, who might have sent it to him.

When asked if the marijuana were his, Ritter responded: "It must be mine, it's got my name on it." This statement is wholly inconsistent with innocence. The possibility of such a response from an innocent person is remote.

The identification of the contents of the package as marijuana when it was opened, standing alone, would not be too significant. It is a matter of common knowledge that many young men and women have a familiarity with marijuana. However, such identification, followed by his other statements, and without any disclaimer of guilt, or intimation that the drug was sent to him without his knowledge or consent, or by mistake, is most significant.

When the marijuana was mailed and dispatched from Florida, the purchase or procurement of it had been completed. There is evidence which, if believed by the trial judge, warranted a finding that the purchase was made with defendant's money, and for him, by his friend. When delivered by the postal authorities and deposited in the mailbox under the joint use and control of defendant and his family, it had reached its destination, and defendant was then in constructive possession. Nothing further remained to be done to the package except for defendant to open, and to use or dispose of its contents.

The Uniform Narcotic Drug Act has been universally adopted by the states, and there are numerous decisions on what constitutes possession of a narcotic drug under the Act. While there are some

analogous to the instant case, the issue is largely a factual one and must be established by evidence of the acts, declarations and conduct of the accused.

The trial judge has found as a fact that Ritter was in possession of marijuana within the contemplation of Virginia's Uniform Narcotic Law. There is evidence to support this finding.

The judgment of the lower court is

*Affirmed.*

GORDON, J., Dissenting.

The trial court held that the warrant did not authorize a search of the Ritter's mailbox, and the Commonwealth did not assign cross-error. So, as the majority tacitly concedes, a search of the mailbox and a seizure of articles found there would have been unauthorized.

But the majority holds that there was no search of the mailbox or seizure of the package addressed to Ritter. I assume this holding is based upon the premise that Ritter's mother freely and without compulsion looked into the mailbox and handed over the package.

Ritter's mother knew that the officers came to search for narcotics under the authority of a search warrant. During the search of the home they asked her whether any package had been received, and she apparently answered no. Finding no package in the home, the officers then asked Ritter's mother if she had collected the mail. She answered no, walked to the mailbox with the officers, and removed the package addressed to Ritter and handed it to the officers.

Looking in the mailbox was part of an overall search of the premises, ostensibly made under the authority of a search warrant. And Ritter's mother did not, I believe, look freely and without compulsion. Rather, I must conclude that Ritter's mother looked into the mailbox and handed over the package because she knew that the officers would look and seize what was found, if she did not. This conclusion, that her actions resulted from coercion, appears dictated by *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed. 2d 797 (1968). *See also Sullivan v. Commonwealth*, 210 Va. 205, 169 S.E.2d 580 (1969).

Since I would reverse on the ground that the package was illegally seized and therefore its contents were improperly admitted into evidence, I do not reach the other questions.