# CIRCUIT COURT OF THE CITY OF NORFOLK

Commonwealth of Virginia

v.

Clint Capers

July 31, 2001

Case No. CR 99003399

BY JUDGE LYDIA CALVERT TAYLOR

The above matter came before the Court on June 21, 2001, for trial on five charges: (1) possession of cocaine with intent to distribute; (2) the same within 1,000 feet of school property; (3) and (4) two counts of possession of a firearm while in possession of cocaine with intent to distribute, one for (1) and one for (2); and (5) possession of marijuana. The Defendant and the Commonwealth having waived a jury, the matter was heard by the undersigned in a bench trial, stretching over parts of three days, June 11, 18, and 19, 2001.

Earlier, the Defendant had moved to suppress a statement the police claimed he made to them orally, after being given *Miranda* warnings, but which Defendant, at least at trial, denied making. However, in his earlier motion to suppress, Defendant alleged that he had not agreed to make a statement or waived his rights after being informed of those rights, but rather that the police had moved immediately to interrogate him, without ascertaining that he was willing to talk. Another judge of this Court heard that motion on March 21, 2000, and denied it, finding the statement to have been freely given after proper warnings and waiver. At trial, the first issue was whether the evidence was sufficient with the Defendant's oral statement, which was found to be admissible, to prove beyond a reasonable doubt

constructive possession by the Defendant, exclusive or joint, of the drugs and guns found by the police in Defendant's residence while executing a search warrant in Defendant's presence. The second issue was, if Defendant constructively possessed those drugs, whether there was additional evidence sufficient to show that the Defendant intended to distribute those drugs.

### Findings of Facts and Decisions on Credibility

The following are the facts the Court heard at the hearing, as well as its credibility decisions as to the believability of facts that were contested.

On March 5, 1999, at approximately 5:45 p.m., police initiated surveillance of the duplex or apartment (it was referred to in various ways) at 3743 Tait Terrace in the City of Norfolk. Investigator A. J. Karpovich of the Vice and Narcotics Squad of the Norfolk Police observed a good deal of foot traffic going to and coming from the residence. A number of individuals on separate occasions approached the house, went inside, stayed for about five minutes, and each then left, all of which is consistent with drug trafficking from a residence. At approximately 8:33 p.m., a search warrant based on that surveillance and on other facts to which Karpovich was the affiant was executed at the house.

There was no challenge to the sufficiency of the facts of the affidavit on which the warrant was issued. Among the facts that supported the warrant was the fact that drugs were known to have been purchased from the house within seventy-two hours of the warrant's issuance. The warrant was executed in a timely fashion after its issuance.

Upon entry, Investigator Chris Hatman, a member of the police entry team that night and the second man into the house, raced immediately through the living and dining areas to the first-floor bathroom, where he saw the Defendant standing by the side of the toilet, which he had just flushed. Hatman's main job on entry was to get to any bathroom in time to stop anyone from trying to flush drugs. The Defendant, whom the Court did not find credible, testified that he had just finished "zipping up" and was turning around when the police entered the bathroom, threw him to the floor, and "planted" the marijuana that the entry team testified was in his hand.

However, Hatman testified that the Defendant was fully dressed and his clothes were not disheveled; Hatman stated unequivocally, "No, he wasn't using the bathroom at all," and "No, he just flushed something," though he did not see exactly what Defendant flushed. Hatman reiterated on re-direct that the defendant was "clearly" not using the restroom facilities. Hatman observed an empty, purple Crown Royal bag and a sock, which bag could have been used to hold drugs.

On direct examination, Investigator Karpovich stated that the Defendant ran away from the entry team as they entered and threw the Crown Royal bag in the bathroom. Defense counsel clarified on cross that Karpovich based that testimony on statements to Karpovich by other policemen who made the first entry, not Hatman, who made the second entry. Those officers stated they saw Defendant leaving the living room when the main entry was made and that he ran to the bathroom, at which point Hatman found him flushing something down the toilet.

As defense counsel failed to ask the court to strike that testimony as hearsay, but rather elicited further details on cross-examination, the court has considered Karpovich's testimony on the issue as substantive evidence, finding it to be reliable.

The police search uncovered other contraband in the residence, including two handguns, cocaine, an Acculab digital scale, and a plate and razor blade ostensibly used for cutting cocaine, all but the second handgun thrown together with items identified to Defendant, such as his wallet and bills and receipts in his name, all found in the top drawer of a dresser in a downstairs bedroom. The second handgun was found in the second drawer of that dresser, the drawer below that in which the cocaine was found. The plate in the top drawer was of a type used for cutting narcotics; the cocaine and the razor blade were on top of the plate. Elsewhere in the bedroom the police found two pagers, three cell phones, and a Caller ID box; Defendant admitted ownership of one pager, the cell phones, and the Caller ID box, but denied ownership of the second pager, testifying that it belonged to his girlfriend.

Corporal Sterling, who was in charge of gathering and maintaining the evidence, described the cocaine found in the downstairs bedroom as consisting of one large rock of crack and four individual plastic bags with smaller rocks of crack, in total 4.94 grams of cocaine. The handgun in the top drawer was a loaded Glock 9mm pistol; it was found within four to five inches of the cocaine. Karpovich, who had confirmed the Defendant lived at the residence prior to obtaining the warrant,[1] identified the downstairs

---

[1] Karpovich also ascertained before obtaining the warrant that Felton Mitchell and Darnell Charles Ellison also lived or stayed with Defendant at the residence on Tait Terrace. When the Defendant was seen leaving the house earlier that day with those two, along with another unknown male, the Defendant himself locked the inner and outer doors. Mitchell and Ellison were stopped in one of the Defendant's cars about the same time the warrant was executed, having left there sometime earlier. Mitchell, when he testified, gave the name of Felton L. Mitchell. He had been referred to in earlier testimony variously as Fenton Marable and Fenton Marshall by the witnesses. Ellison, who had previously been convicted of drug distribution,

bedroom where the drugs were found as the Defendant's, in part because of the clothing found in the closet, Dallas Cowboy clothing, the type he was seen by the police previously wearing every time they had done surveillance in the several days before the search, and in part on the prescription bottles in his name in that bedroom, as well as bills and recent receipts in his name, and his wallet in the top drawer. These bills were addressed to the Defendant at the Tait Terrace address. Although some papers in the top dresser drawer had other names on them, many were in the names of previous roommates, which would have been given, logically, to the Defendant upon their moving out; all of them had old dates. The only recent receipts were in the name of the Defendant at his current address, Tait Terrace, where he had only lived for about three months. Nothing in the room, including papers or anything in the drawers or the clothing or on top of the furniture, indicated anything belonging to anyone but the Defendant. Additionally, when asked by the police if there were any other drugs or guns in the house besides those found in Defendant's bedroom, Defendant answered no, thereby confirming the police assumption that the downstairs bedroom was in fact his. Additionally, Ellison and Mitchell both told the police at the police operations center after their arrest that each occupied one of the upstairs bedrooms, hearsay evidence that was not objected to and which the court found reliable. Also, Defendant's driver's license was found by the police upon entry on the living room floor, directly next to several piles of cash, separated by denominations, totaling $1,234.

After the Defendant was arrested, Investigator Karpovich orally instructed him as to his rights under *Miranda v. Arizona*, which rights he waived by choosing to answer questions then put to him by Karpovich.

The Defendant raised at his suppression hearing an issue that he reasserted at trial, that, although Defendant was told and stated that he understood orally each of his rights, he should have been asked the additional question of whether he wanted to make a statement rather than the officers going directly into interrogation, asking Defendant questions without ascertaining with certainty that Defendant wished to make a statement. However, this Court finds, in the context of the officer's testimony and his explanation as to how the Defendant was "Mirandized," that Defendant was explained his rights, understood his rights, and, when questioned, knew from that colloquy that he could at any time assert his right to remain silent or to

---

had a small amount consistent with personal use on him when arrested in one of the Defendant's cars. He was convicted of possession of cocaine based on those drugs found on his person.

have a lawyer. The Defendant's intelligent waiver of his rights and the voluntary nature of his answers are made clear by the fact that he quickly asserted his rights, to stop the questioning and to have a lawyer present, a few moments later when he thought he was being pushed by the officer to give too many specifics as to the time frame of his drug dealings.

Although Karpovich did not take any contemporaneous notes of the conversation he had with the Defendant after giving him the *Miranda* warnings, he was able to reconstruct the conversation he had had at Defendant's residence three to four hours following the interrogation at the Police Operations Center, at or shortly before 1 a.m. At that time, he dictated the questions he had propounded to and the answers he had received from the Defendant. The fact that the dictation was in question-and-answer form adds to the Court's belief that the re-creation is accurate, as it was re-created in the very form in which it actually took place. It was dictated only three to four hours later at the P.O.C. A trained professional in questioning, such as Karpovich, would be able to recollect details of such a short but purposeful interrogation for a few brief hours afterward, and Karpovich obviously was able to do so.

Karpovich testified he had asked the Defendant if there was more cocaine in the house and, second, if there were more weapons than those found in Defendant's bedroom, to both of which the Defendant answered "no."[2] He thereby acknowledged knowing of the drugs and weapons seized, that they were in his room, and that he knew where any drugs and weapons in the house would be found. Defendant at first told Karpovich he had not worked in quite a while and at that time made $300, (I Trans. 35 (June 11, 2001)), and that he did not work, yet, when asked how he paid for his television, cars, and other property, he answered, "I make good money." *Id.* at 36. Nevertheless, he denied the money next to his driver's license on the floor was his, adding that he thought his license was in his pocket. *Id.* When Karpovich asked the Defendant how long he had been dealing drugs from that address, the Defendant replied, "Not very long." *Id.* Only when pressed by Karpovich for specifics as to the length of time — "years, months, days?" — did the Defendant invoke his rights by saying, "I think I want a lawyer."

The evidence on the issue of intent to distribute, as with the constructive possession, was both direct and circumstantial. Investigator Sterling testified

---

[2]   Karpovich stated, "I asked Mr. Capers if there was more cocaine in the house besides what was found in his bedroom. He said no." 1 Trans. 34 (June 11, 2001). That admission shows knowledge of both the presence and character of the substance.

that the amount recovered from Defendant's bedroom was inconsistent with personal use. In addition, there was no evidence of personal use, including no paraphernalia, either on Defendant's person, in his bedroom, or elsewhere in the residence. Although cell phones and beepers are not limited to use in drug distribution, they are consistent with drug dealing; the digital scale, razor, and plate all are used for weighing and cutting cocaine for distribution. That the Defendant, who claimed he had not done tile work for "quite a while," then said he made "good money," suggests another, illegal source of income, not from legitimate work. The court may reasonably infer, then, that the $1,234 left on the floor in piles of like denominations next to his driver's license upon the police's rapid entry was Defendant's; aside from his girlfriend, who claimed she was in the kitchen at the time, and her baby, Defendant was the only person in the house at the time. This Court, then, reasonably infers that the Defendant was counting out the money when he heard the police. Realizing that they were going to enter, he raced to the bathroom to try to flush some drugs down the toilet, in such a hurry to get rid of the drugs that he left a large amount of currency and his driver's license on the floor.

No rational person would have walked out the door and left over $1200 in cash on the floor, especially with the traffic of friends and family in and out of the house, as claimed by Defendant. However, a person hearing police at the door and fearing they would enter and discover contraband drugs would race to the bathroom to get rid of the drugs, as opposed to being primarily concerned about the loss of the money. Money could be earned back with the next sale; police discovery of possession of drugs would likely lead to incarceration. The logic of Defendant's actions, and the illogic of anyone else in the house having left such a sum on the floor when he or she departed the residence, combines with the driver's license to persuade this Court beyond a reasonable doubt that the money was Defendant's.

Following the presentation of the Commonwealth's evidence tying the Defendant to the drugs and an intent to distribute those drugs, the Defendant presented a parade of friends on the stand, each clearly attempting to avoid having their friend convicted of drug distribution and gun charges. Unfortunately, they told stories that were neither consistent with one another nor internally consistent, often contradicting their own earlier statements. None of the Defendant's witnesses, all long-time friends of his, testified credibly or consistently.

Ellison, a friend of the Defendant's, claimed he was basically homeless but had stayed at Tait Terrace with the Defendant and Mitchell; he claimed that Mitchell had a key but he did not. He claimed at first that no one slept in any particular place, but admitted he told police the day of the search that the Defendant's bedroom was the one downstairs in which the drugs were found.

At trial, he offered an unpersuasive excuse for not having told them what he testified to at trial. He also claimed that the foot traffic in and out of the home was "family and friends," not people buying drugs, that he never saw drugs or money in the house, and never saw the Defendant do drugs, although he admitted he had seen Defendant with a scale, just not the scale seized with the drugs in the downstairs dresser drawer. Although Ellison admitted to a conviction for dealing drugs, he denied he had *ever* seen scales used in dealing drugs. His candor was suspect, to say the least.

Cecil Keeling, a friend of Defendant's for twenty years, testified that when he visited at Tait Terrace, Defendant "egressed" from upstairs and was "always" going up the stairs and back down. (Keeling, however, didn't "really go in the house very often," so it was difficult to see how he could say what the Defendant was "always" doing in the house.) Felton Mitchell,[3] who had known the Defendant four or five years, met Ellison through the Defendant and then came to live with the two of them at Tait Terrace. He claimed Ellison slept downstairs in the room where the drugs were found, whereas he, Mitchell, slept in the computer room downstairs and the Defendant slept upstairs. He contradicted himself several times, stating on direct that "no one slept in any particular place" and that the Defendant only sometimes slept upstairs, all in contrast to his statement to the police the night of the arrest that the downstairs bedroom was the Defendant's. Of course, Mitchell also denied knowing anything about or having seen any drugs or guns in the house, and, like Ellison, claimed the traffic that was constantly coming to and leaving the house after a few minutes consisted of only family and friends. Mitchell also knew nothing of Defendant or Ellison doing drugs, although he admitted he had seen Ellison with drugs several times, but outside the house. To the extent the Court accepted any of his testimony, his knowledge was clearly limited, for example, his admission that when he leaves and returns to the duplex, "it is dark." He made claim himself to the Dallas Cowboys clothing, stating that the Defendant was not a Dallas Cowboys fan. (The police testified, to the contrary, that Defendant had always been seen in Dallas Cowboy clothing on earlier surveillances.) He claimed the Defendant kept no property in the downstairs bedroom but was unable to explain how bills and property of the Defendant were found there.

Torey Locke, who had known the Defendant ten to fifteen years, stated that, like the other defense witnesses, he had never seen any drugs or guns in the house, but, unlike Ellison, he had never seen Defendant with a scale. He

---

[3] He was referred to variously as Fenton Marable or Marshall by the prosecution witnesses and "Lynburg" by at least one defense witness.

claimed to have sold the Defendant a bed, which Defendant put in the upstairs bedroom. (Of course, that was not probative as to who stayed upstairs, as Defendant himself testified he owned *all* the furniture in the house.) Asked where the Defendant stayed, he testified he saw Defendant go upstairs after taking a shower and come back down fully dressed.

Tamika Tatum, the Defendant's girlfriend and the mother of his child, was in the house with the Defendant when the warrant was executed. She said she and Defendant slept upstairs in a waterbed whenever she spent the night. She claimed that on the day the warrant was executed, she and Defendant had arrived from the store only five to ten minutes before the police entered the residence. She also claimed to have never seen drugs, guns, or money in the house and did not see the money on the floor that evening. When questioned about that, she offered the explanation that she and the Defendant entered through the back door and that she had not been to the front part of the house and the living room when the police arrived. Defendant, she said, went straight to the restroom and never came out until the police arrived. (That statement conflicts with the police evidence that Defendant was in the living room/entry area and fled to the bathroom only upon the arrival of the police.)

Defendant testified that at the time of the police execution of the warrant, he lived at the address with Mitchell and Ellison, who had moved in during December of 1998. He said he slept upstairs, whereas Ellison slept downstairs, having taken over that room at the beginning of March, when an earlier roommate, Riggins, had moved out. (As the warrant was only executed March 5, by Defendant's testimony Ellison had only been living in the house a few days at most.) Defendant described all the furniture in the house as his, implying at one point that he used the dresser in the downstairs bedroom. He stated that there were no drugs or guns in the top dresser drawer the *last time* he had gone there. In attempting to explain the presence of bills in the drawer with the drugs, bills in his name and at that address as well as at previous addresses of his, he lamely offered that someone may have picked them up and put them in there. As to his wallet, his only explanation was that he had last seen it some eight years before — a patently preposterous story. Contradicting Ellison's testimony, to the contrary, Defendant denied ever using a scale. He offered no reason why he had three cell phones and two pagers, all of which he claimed were nonfunctional. He later changed his testimony as to ownership of all of them, stating that one of the pagers was not his. As to any explanation of the answers to questions that Karpovich attributed to him, he denied making any statement at all to Karpovich, a denial this Court did not find credible and that conflicts with his motion to suppress the statement, which did not deny the statement was made but rather claimed it was *given* in violation of his *Miranda* rights.

*Legal Analysis*

With the exception of the marijuana found in the Defendant's hand after he was apprehended in the bathroom, the possessions charged in this case are all constructive, as neither the guns nor the cocaine were discovered on the Defendant's person. Actual possession is not essential to a conviction for possession, however. "The defendant may be shown to have had constructive possession by establishing" that the contraband was "subject to his dominion and control." *Ritter v. Commonwealth*, 210 Va. 732, 741, 173 S.E.2d 799, 805-06 (1970). "The Commonwealth must point to evidence of acts, statements, or conduct of the accused or other facts or circumstances which tend to show that the defendant was aware of both the presence and the character of the substance and that it was subject to his dominion and control" to base a conviction on constructive possession. *Drew v. Commonwealth*, 230 Va. 471, 473, 388 S.E.2d 844, 845 (1986). Although mere occupancy or ownership of the premises in which contraband is found does not create a presumption of possession under § 18.2-250 and alone cannot establish constructive possession, "such evidence is probative." *Powers v. Commonwealth*, 227 Va. 474, 476, 316 S.E.2d 739, 740 (1984). However, "[c]ircumstances of suspicion, no matter how grave or strong, are not proof of guilt sufficient to support a verdict of guilty." *Clodfelter v. Commonwealth*, 218 Va. 619, 623, 238 S.E.2d 820, 822 (1977).

While the above statements of law regarding constructive possession are well established in Virginia case law, their meaning and application to the instant case can only be ascertained through careful analysis and comparison of the facts involved in the different appellate cases involving constructive possession. Unfortunately, even after such an analysis, the application in a particular case is not always entirely clear. In *Clodfelter*, evidence introduced at the trial court established that the defendant had rented a hotel room in which drugs were later found, placed some of his personal effects in the room, and gave the police a false identity when questioned. The Virginia Supreme Court reversed defendant's conviction and noted that the "evidence creates a strong suspicion of guilt, but it falls short of showing beyond a reasonable doubt that the drugs found in the hotel room were ever actually or constructively possessed by Clodfelter with an awareness of their character." *Clodfelter*, 218 Va. at 623, 238 S.E.2d at 822.

In *Drew*, police observed 22 people enter the defendant's residence, remain there briefly, and then exit over the course of an hour. When the police returned to search the residence after obtaining a warrant, the defendant was standing on the street two doors down from the residence. In addition to a large quantity of cocaine, the police recovered a telephone bill, a

checkbook, a bank statement, and other documents, all of which bore the name of the defendant and the address of the residence. Stating that there was "no evidence of statements or conduct which tend to show that Drew was aware of the presence of cocaine in the dwelling," the Court held the evidence of constructive possession to be insufficient and reversed the conviction. *Drew*, 230 Va. at 473, 338 S.E.2d at 845.

*Huvar v. Commonwealth*, 212 Va. 667, 187 S.E.2d 177 (1972), is another instructive case from the Virginia Supreme Court. Huvar had just arrived at an acquaintance's apartment when the police entered with a search warrant. The police recovered a large quantity of Schedule IV drugs throughout the three-room apartment but did not recover anything from Huvar's person; there were eleven other people in the apartment when the police entered. The Virginia Supreme Court reversed Huvar's conviction based on constructive possession and, in doing so, emphasized that the defendant "made no statement, committed no act, and indulged in no conduct from which the inference could be fairly drawn that he possessed or controlled the drugs which the police found." *Huvar*, 212 Va. at 668, 187 S.E.2d at 178.

*Burchette v. Commonwealth*, 15 Va. App. 432, 425 S.E.2d 81 (1992), is yet another constructive possession case, this one from the Court of Appeals, in which the evidence was held to be insufficient to support a conviction based on that theory. In *Burchette*, a search of the defendant's locked automobile resulted in the recovery of ten baggies containing marijuana, a loaded 9mm handgun, a cell phone, a cell phone bill with the defendant's name on it, a wallet with the defendant's driver's license in it, as well as scales and other packaging materials. Evidence at trial established that the defendant owned the vehicle and had walked past it only a short while before he was apprehended. In reversing the conviction, the Court of Appeals stated:

> The Commonwealth presented no evidence from which one could reasonably infer that Burchette occupied the vehicle or had dominion over it *while the marijuana was present in it*. The evidence failed to show either when Burchette may have used or occupied the vehicle or when and for how long the drugs or paraphernalia had been in it. The evidence failed to show that Burchette was the exclusive or primary operator of the vehicle, or that he possessed a set of keys to the vehicle, or when or by whom the vehicle had been most recently operated or occupied. The circumstances were not such that one reasonably could infer, to the exclusion of other reasonable hypotheses, that Burchette, as the owner of the vehicle, knew of the presence, nature, and character of the contraband that was found in it.

*Burchette*, 15 Va. App. at 435-36, 425 S.E.2d at 83-84 (emphasis added). Furthermore, the Court of Appeals unequivocally asserted that in *Burchette* the bills and wallet found in the vehicle did not "establish that he had been in the vehicle when the contraband was present." *Burchette*, 15 Va. App. at 438, 425 S.E.2d at 85-86.

Some Virginia Supreme Court cases have affirmed convictions based on constructive possession; one such case is *Eckhart v. Commonwealth*, 222 Va. 447, 281 S.E.2d 853 (1981). The defendant, Susan Eckhart, was found in her home sitting on a stool holding her baby just outside a bedroom in which there was a crib, baby clothing, scales, and almost five pounds of marijuana packaged in various ways. All of the items, save one large bag containing six solid blocks of marijuana, were plainly visible from where the defendant was sitting. From this evidence, the Supreme Court held that the trial court "could reasonably conclude that she was aware of the contents of the room and had stationed herself where she could exercise dominion and control over the marijuana." *Eckhart*, 222 Va. at 451, 281 S.E.2d at 855.

How do those cases compare to the facts here? Unlike *Huvar*, the Defendant in the instant case was in his own home, with only his girlfriend and her small child. In *Burchette*, the Court held that the state had not proven that Defendant knew of the presence and character of the drugs because there was no evidence suggesting (1) that the defendant was the primary or most recent operator or occupant of his vehicle; (2) was actually present in the car at any time the drugs were present there; or (3) had keys to the car. Here, in contrast, the Defendant was actually in his own house when the drugs were found there; this Court has found that the bedroom in question where the drugs were kept belonged to and was occupied by the Defendant; and the Defendant had and used a key to enter and leave the house before the drugs were found there. In *Drew*, a major argument against conviction was that the defendant was not actually in the house when the police entered and seized the drugs and thus it was uncertain that he had been in the house while the drugs were actually present. In this case, however, the Defendant was in the home when the drugs were found. Another significant difference between *Drew* and the instant action was the lack of conduct by Drew suggesting he was aware of the presence of the drugs. In contrast, this Court has found that the Defendant fled from the police upon their entry to flush drugs down the toilet, conduct clearly suggesting control over and awareness of the character of the illegal drugs. Similarly, in *Clodfelter*, the defendant was not present in the hotel room when the drugs were found. On the other hand, the instant action may be likened to *Eckhart* in which it appears that the court allowed the inference that the defendant, who was holding a baby, had entered the room recently due to the presence of the crib and baby things. In this case, the

Defendant regularly slept in that room at night and the presence of his personal belongings, including recent bills, his wallet, and his ownership of the dresser show his recent and controlling use of that piece of furniture.

Additionally, cases holding that evidence of constructive possession was insufficient state that circumstantial evidence relied on must be wholly inconsistent with innocence and consistent only with guilt. However, the instant case is not an entirely circumstantial case. Leave aside the Defendant's flight from the police and successful effort to flush down the toilet some of the drugs in the house — even at the risk of losing over $1,200 in cash to which he could not afford to lay claim to the police. Beyond those actions by the Defendant, this Court has before it the Defendant's own admission to Karpovich, which takes this case out of the category of constructive possession cases based on circumstantial evidence *only*. Defendant's answers clearly acknowledge his awareness of the presence and character of the drugs, as well as the presence of the guns found in the dresser, plus his intent to distribute the drugs, based on his admission to a continuing distribution by him of drugs over some period of recent time.

Thus, the evidence establishes beyond a reasonable doubt that the Defendant constructively possessed cocaine with intent to distribute it, as well as possessed a firearm while in possession of cocaine with the intent to distribute that cocaine, as well as actually possessing marijuana. However, it is not clear that the Defendant's statement acknowledging a gun or guns showed awareness of *two* guns; in answer to Karpovich's question whether there were "any other weapons in the house other than the ones found in his bedroom," Defendant said no, clearly implying he knew of at least one weapon in his bedroom. However, the Court finds that, where there was no further detailing of exactly what was found, and the plural could have been confused with the singular, Defendant can only be found guilty beyond a reasonable doubt of constructively possessing and acknowledging one gun found in the dresser, next to the cocaine he also clearly acknowledged. Thus, this Court finds that Defendant's statement, plus the circumstantial evidence, proves him guilty of one count, but is insufficient to prove the second count beyond a reasonable doubt.

As to the charge of possession with intent to distribute near school grounds, this Court finds the evidence does not show a violation of Code of Virginia § 18.2-255.2, which states: "It shall be unlawful for any person to manufacture, sell, or distribute or possess with intent to sell, give, or distribute any controlled substance, imitation controlled substance, or marijuana at any time while … (ii) upon public property or any property open to public use within 1,000 feet of such school property." The Court of Appeals, in *Smith v. Commonwealth*, 26 Va. App. 620, 496 S.E.2d 117

(1998), considered the meaning of the phrase "upon public property or any property open to public use." The Court determined that the General Assembly intended the statute apply to those who sell narcotics "in such areas where children congregate in large numbers before, during, and after school sessions." *Smith*, 26 Va. App. at 626, 496 S.E.2d at 119-20 (citing *Commonwealth v. Burns*, 240 Va. 171, 178, 395 S.E.2d 456, 459 (1990)). The Court held that a convenience store parking lot was "property open to public use." The Court finds that, in this context, that while possession of drugs inside a house is illegal, the interior of the house, although it may be located within 1,000 feet of school property, is not what is meant by "property open to public use." Therefore, the Court finds the evidence insufficient on the second firearm charge and the drugs within 1,000 feet of a school charge and dismisses the two charges.